CIRCUIT CITY STORES, INC. *vs.* COMMISSIONER OF REVENUE.

Suffolk. April 10, 2003. - June 25, 2003.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & SOSMAN, JJ.

*Taxation,* Appellate Tax Board: findings; Sales and use tax; Excise. *Uniform Commercial Code,* Sale of goods, Title. *Statute,* Construction.

Transactions in which customers of the taxpayer, a national retailer of electronic equipment, purchased merchandise in Massachusetts but picked up that merchandise in New Hampshire, and in which sales were credited to the Massachusetts stores, title to the purchased goods passed in Massachusetts, and sales representatives in the Massachusetts stores received commissions on the sales, constituted taxable transactions under G. L. c. 64H, § 2, imposing sales tax on "sales at retail in the commonwealth, by any vendor, of tangible personal property . . . at the rate of five percent," and therefore, the Appellate Tax Board properly rejected the challenge of the taxpayer to the refusal of the Commissioner of Revenue to abate "sales/use" tax assessed for such transactions. [633-641]

This court stated that unresolved matters with respect to a taxpayer's liability for the tax period at issue, including any amount of credit owed to the taxpayer based on tax payments remitted to the Commonwealth during this period, were matters to be determined by the Commissioner of Revenue on the bringing of an application for abatement by the taxpayer pursuant to G. L. c. 62C, § 37. [641-642]

APPEAL from a decision of the Appellate Tax Board.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*William E. Halmkin (David J. Nagle* with him) for the taxpayer.

*John R. Hitt,* Assistant Attorney General, for the Commissioner of Revenue.

*Peter L. Banis,* pro se.

The following submitted briefs for amici curiae:

*Holly K. Hemphill & Joshua D. Odintz,* of the District of Columbia, *& Donald M. Griswold* for International Mass Retail Association.

*Stephen Ziobrowski* for The National Retail Federation.

*Kathleen King Parker* for Council on State Taxation.

GREANEY, J. At issue in this tax appeal is whether Circuit City Stores, Inc. (Circuit City), is liable for Massachusetts excise with respect to its sales of its products to customers in stores located in Massachusetts, who subsequently travel to stores in another State to pick up their purchased merchandise. The Appellate Tax Board (board) rejected Circuit City's challenge to the refusal by the Commissioner of Revenue (commissioner) to abate $172,460 (plus interest and penalties) in "sales/use" tax assessed against it for transactions in which merchandise purchased in Massachusetts was picked up by the customer in New Hampshire, between April 1, 1993, and March 31, 1996. Circuit City argues that the transactions were sales occurring in New Hampshire and, therefore, no tax is due under G. L. c. 64H, § 2, which imposes sales tax on "sales at retail in the commonwealth, by any vendor, of tangible personal property . . . at the rate of five percent." Circuit City contends that the purchases became taxable in Massachusetts, if at all, under the use tax statute, G. L. c. 64I, § 2, when the customer brought the purchased items into the Commonwealth for "storage, use or other consumption" and after Circuit City's involvement with the transaction had ended. We transferred to this court Circuit City's appeal from the decision of the board that taxes properly were assessed. We conclude that the transactions were taxable under G. L. c. 64H, § 2, and now affirm the board's decision.

1. The board found the following facts. Circuit City, a Virginia corporation with its principal place of business in Henrico County, Virginia, is a national retailer of electronic equipment. During the relevant tax period, Circuit City operated eighteen retail stores and a distribution center in Massachusetts, as well as a number of stores in New Hampshire, Rhode Island, and Connecticut. As a convenience to its customers (part of an overall philosophy "to wow the customer"), Circuit City offers a sales option that allows a customer to purchase merchandise at one Circuit City store but elect to pick up the merchandise at an alternative store location. Circuit City refers to such transactions as "alternative location sales" and determines the taxability of these sales based on the location where the item is

released to the customer. Because New Hampshire collects no State excise tax, customers of Circuit City stores in Massachusetts willing to travel to a Circuit City store in New Hampshire to pick up their purchases are able to save the five per cent sales tax that otherwise would be added to the retail price pursuant to G. L. c. 64H, § 2.

All Circuit City's so-called "alternative location sales" transactions are specifically coded in the company's inventory computer, or distributive process, system (DPS system) to differentiate them from transactions in which purchased merchandise is carried from the cash register by the customer, delivered by Circuit City to a recipient, or picked up by the customer at the pick-up counter of the store where purchased. The DPS system also records other pertinent information, including the store locations where the item is purchased and where it is to be picked up; the name, address, and telephone number of the purchaser; the item purchased, including the brand, model, and sales price of the item; and the imposition of any sales tax due on the item, based on the location where pick up is to occur.

Circuit City's customer receipt, generated at the time of the purchase and given to the customer, contains information similar to that recorded in the DPS system. Specifically, the customer receipt indicates the store location where the item was purchased and a description of the item, including its brand, model, and sales price. For alternative location sales, the customer receipt also includes the notation "reserved" and the location of the Circuit City store designated for pick up. The "reserved" designation does not mean that a particular item with a particular serial number physically has been set aside for the customer, but, rather, that one less item is available for sale to other customers in the designated store's inventory.

When the customer arrives at the designated alternative location store, the customer presents the customer receipt to the store's customer service representative. The pertinent information is entered into the DPS system, and a pick-up ticket is generated in the store's warehouse. A Circuit City employee then removes an item matching the make and model specified on the pick-up ticket from the warehouse inventory, verifies the item by entering its serial number into an electronic scanner,

and releases the item to the customer at the pick-up counter. Circuit City's DPS system then credits the sale to the Massachusetts store and credits a sales commission to the sales associate who initiated the sale at the Massachusetts store. Until the merchandise is picked up, customers may demand a refund or exchange at the store where the original sale occurred or choose to pick up the merchandise there instead of traveling to the designated alternative location.[1]

The board heard testimony of three Circuit City customers who had entered into alternative location sales. All three witnesses, who had been sequestered during each other's testimony, testified that they had purchased items (a television, a videocassette recorder, and computer equipment) at a Circuit City store in Massachusetts and, following advice from a Circuit City employee that Massachusetts sales tax could be avoided by picking their purchases up in New Hampshire, elected to do so. According to the testimony of two customers, one Circuit City sales associate drew a map indicating driving directions to the nearest New Hampshire store. All three witnesses stated that the pick up of their respective items in New Hampshire involved simply presenting their customer receipts to claim the merchandise. No additional amounts were charged, and no other transactions transpired at that time.[2]

After conducting a tax audit, the commissioner assessed Circuit City for "sales/use" taxes relating to alternative location sales occurring between April 1, 1993, and March 31, 1996, in which customers purchased merchandise at three different

---

[1]We agree with the board's determination that "there is nothing in the record to suggest that the customers would be prevented from deciding to pick up the item at the Massachusetts store rather than travel to the alternative location."

[2]In the absence of any evidence to the contrary, we leave undisturbed the board's finding that the accounts of the three witnesses of their experiences are representative of the manner in which Circuit City's alternative location sales option operated in the audited Massachusetts stores. We agree with Circuit City, however, that the record demonstrates neither a corporate policy of tax evasion nor a general sales practice on the part of Circuit City of encouraging customers to engage in tax avoidance. It is the taxability of alternative location sales, however, and not the motive behind the alternative location sales option, that is dispositive of this appeal.

Circuit City stores in Massachusetts and designated that they would travel to a New Hampshire Circuit City store to pick up the item.[3] Circuit City paid the assessment in full and filed a timely application for an abatement that was deemed denied. It then filed a petition with the board pursuant to G. L. c. 62C, § 39, challenging the denial of the abatement. In its decision, the board concluded that the alternative location sales at issue qualified as Massachusetts sales and, thus, were properly subject to "sales/use" tax.[4]

2. We now consider the merits of this appeal, which involve issues of statutory interpretation and no constitutional claims. As a general rule, a decision of the board will not be disturbed unless unsupported by substantial evidence or based on an error of law. Factual findings of the board ordinarily are final, and the taxpayer has the burden of proving as matter of law its right to an abatement of the tax. See *Kennametal, Inc.* v. *Commissioner of Revenue*, 426 Mass. 39, 43 (1997), cert. denied, 523 U.S. 1059 (1998); *M & T Charters, Inc.* v. *Commissioner of Revenue*, 404 Mass. 137, 140 (1989).

Only retail sales[5] that occur in Massachusetts are subject to the sales tax imposed by G. L. c. 64H, § 2. The parties agree that the statutory definition of a sale in G. L. c. 64H, § 1, applies and, thus, a sale, for purposes of this appeal, includes "any transfer of title or possession . . . of tangible personal property . . . by any means whatsoever." The focus of the parties' disagreement is when, and where, title passed from Circuit City to the customers in connection with the purchased

---

[3]Circuit City was assessed a total of $281,227.87 (including interest and penalties for the periods at issue) for taxes relating to four separate issues: exempt sales; ($12,035); expense items ($1,044); fixed assets ($10,310); and alternative location sales ($172,460). The assessment relating to alternative location sales is the only assessment at issue in this appeal.

[4]The board also concluded that the classification of the tax as a "sales/use" tax does not render the assessment void and that the audit methods employed by the commissioner were neither unreliable nor invalid in the circumstances of this appeal. Circuit City does not now challenge these determinations.

[5]A "[s]ale at retail" is a "sale of services or tangible personal property or both for any purpose other than resale in the regular course of business." G. L. c. 64H, § 1.

merchandise in the alternative location sales at issue.[6] The commissioner asserts that title passed at the cash register when Circuit City received payment for the merchandise and the customer sales receipt, representing ownership of the purchased goods, was handed to the customer. Circuit City argues that title did not pass until the purchased merchandise was physically placed in the customer's hands in New Hampshire.[7] So far as we are aware, the concept of title in circumstances, as here, where modern inventory computer systems allow a multi-State corporation to accept full payment in one State for merchandise located in another State, while simultaneously "reserving" the merchandise (purchased "sight unseen") with the understanding that the customer will take physical possession of the merchan-

---

[6]Title, of course, is not necessarily synonymous with possession. Because we conclude that title passes to the customers in Massachusetts, however, we need not determine when and where "possession" passed for sales tax purposes. As recognized by the board, an argument could be made that, although the customer's receipt of the merchandise occurred in New Hampshire, they received the right to possess the merchandise in Massachusetts. According to this line of reasoning, Circuit City retained physical possession of the purchased merchandise, but it did so at the direction of the customer and for the customer's convenience and, therefore, constructive possession passed to the customer in Massachusetts. See *Browning-Ferris Indus., Inc.* v. *State Tax Comm'n*, 375 Mass. 326, 330 n.4 (1978); *R.J. Reynolds Tobacco Co.* v. *Boston & Me. R.R.*, 298 Mass. 152, 155 (1937).

[7]As has been stated, Circuit City acknowledges that use tax could apply when (and if) the purchased merchandise is brought into Massachusetts. See G. L. c. 64I, § 2. It is well established that the use tax and the sales tax are complementary components of our tax system, created to " 'reach all transactions, except those expressly exempted, "in which tangible personal property is sold inside or outside the Commonwealth for storage, use, or other consumption within the Commonwealth." ' *M & T Charters, Inc.* v. *Commissioner of Revenue*, 404 Mass. 137, 140 (1989), quoting *Boston Tow Boat Co.* v. *State Tax Comm'n*, 366 Mass. 474, 477 (1974); *Towle* v. *Commissioner of Revenue*, [397 Mass. 599, 604 (1986)]. The use tax was thus designed 'to prevent the loss of sales tax revenue by out-of-State purchases,' *M & T Charters, Inc.* v. *Commissioner of Revenue, supra*, and to protect local merchants from loss of business to merchants in other States with lower or nonexistent sales taxes." *Commissioner of Revenue* v. *J.C. Penney Co.*, 431 Mass. 684, 687 (2000). Circuit City contends, however, that it is the customers themselves who are personally liable to the Commonwealth for use tax on their purchases. Because we conclude that the applicable excise in these circumstances is the sales tax, and not the use tax, we need not address the scope of Circuit City's obligations under G. L. c. 64I, § 4, to collect use tax from its customers, and remit it to the Commonwealth.

dise at his or her convenience, has yet to be considered by an appellate court.

Our tax statutes provide no explicit definition of the term "title," and so we look for guidance to the Uniform Commercial Code (UCC), incorporated into the General Laws as chapter 106. See *Associated Testing Lab., Inc.* v. *Commissioner of Revenue*, 429 Mass. 628, 633-634 (1999); *Sherman* v. *Commissioner of Revenue*, 24 Mass. App. Ct. 64, 66-67 (1987). See also 830 Code Mass. Regs. § 64H.6.7 (1993) (passage of title for sales tax purposes defined as in UCC). Section 2-401 of the UCC instructs on the concept of title.[8] With respect to situations, as here, where "matters concerning title become material," § 2-401 (2) provides that, "[u]nless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods."[9]

[8]Although the passage of title is the material element of a sale for tax purposes, the concept of title is of small significance in determining the rights of the parties under Article 2 of the Uniform Commercial Code (UCC). See 1 W.D. Hawkland, Uniform Commercial Code Series § 2-401:1 (2001). The introductory sentence of § 2-401 of the UCC sets forth a statement of policy that the rights and obligations of parties under the UCC should be determined without dependence on the concept of title. See G. L. c. 106, § 2-401 ("Each provision of this Article with regard to the rights, obligations and remedies of the [parties] applies irrespective of title to the goods except where the provision refers to such title"). See also in this regard other provisions of the UCC governing rights and duties of the buyer and seller in specific situations, e.g., G. L. c. 106, § 2-501 (insurable interest), §§ 2-509 and 2-510 (risk of loss), § 2-709 (right to damages or price), and § 2-722 (right to sue third parties for damages to goods).

[9]In circumstances where "delivery is to be made without moving the goods," § 2-401 (3) provides that, unless otherwise explicitly agreed: "(*a*) if the seller is to deliver a document of title, title passes at the time when and the place where he delivers such documents; or (*b*) if the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting."

The commissioner contends that delivery is made in alternative location sales "without moving the goods" and, therefore, according to § 2-401 (3), title passes "at the time and place of contracting" — at the cash register in Massachusetts. This position assumes a broad understanding of the term "delivery" similar to that explained in our discussion under § 2-401 (2), *infra* at 636. In our view, analysis of the passage of title under the provisions of § 2-401 (2) is more straightforward. See *Mechanics Nat'l Bank* v. *Gaucher*, 7 Mass. App. Ct. 143, 147 (1979) (§ 2-401 [2] applies to property requiring

We discern no explicit agreement between the parties concerning passage of title. Circuit City claims that testimony at the hearing with respect to its handling of alternative location sales (i.e., that Circuit City does not book the sale, credit the sale, or consider the sale to have occurred until the product is physically released to the customer) indicates an understanding between the parties that the transaction that takes place in Massachusetts constitutes, not a concluded sale, but only an order for merchandise. We disagree. The events transpiring at the cash register in Massachusetts reflect a significant degree of understanding between Circuit City and its customers that a sale, and not a mere deposit on an order, has occurred. The customer sales receipt, although not a document of title, contains a description of the item or items purchased, as well as the time and date of the sale. The record suggests that, in an ordinary case, any period of warranty relevant to the purchase begins as of this date. The purchase price reflected on the receipt represents full consideration paid for the merchandise. From the vantage point of the customer, the sales receipt represents proof of his or her right to the purchased merchandise. The fact the sale is credited to the Massachusetts store, and the commission accorded the sales associate in Massachusetts, in our view, is indicative of an intent on Circuit City's part that more than an order for merchandise takes place in Massachusetts.[10]

The physical retention of the merchandise by Circuit City is not dispositive of "the time and place at which the seller completes his performance with reference to the physical delivery of the goods" under the UCC. G. L. c. 106, § 2-401 (2).[11] Section § 2-503 (1) describes acceptable methods of a seller's tender

---

special handling enabling buyer to take possession or where purchase price has been paid and seller holds goods for convenience of buyer).

[10]This inference is supported by testimony of a Circuit City district manager, who stated that, after an alternative sales transaction is entered into the DPS system in Massachusetts, a customer's change of mind with respect to desired merchandise or pick-up location may only be accommodated by voiding the original sale and transacting a new one.

[11]We note that proposed amendments to art. 2 of the Uniform Commercial Code (UCC), submitted to the members of the American Law Institute for discussion at the eightieth annual meeting in May, 2003, leaves § 2-401 (2) substantively unchanged, with the exception of the elimination of "physical" preceding "delivery." The proposed amendments also suggest changes that

of delivery and states the following: "Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery. The manner, time and place for tender are determined by the agreement and this Article, and in particular . . . tender must be at a reasonable hour, and if it is of goods they must be kept available for the period reasonably necessary to enable the buyer to take possession . . . ."

Under common law as well, title may pass although the goods are still in the actual possession of the vendor. See *Bristol Mfg. Co.* v. *Arkwright Mills*, 213 Mass. 172, 176-177 (1912). As under the UCC, the inquiry centers, not on physical transfer of the goods, but on whether goods are placed within the actual or constructive possession of another. See *Mitchell* v. *LeClair*, 165 Mass. 308, 310-311 (1896) ("Under a contract of sale, when the goods have been . . . appropriated and set apart, the vendor has done that which by the terms of the agreement makes the whole consideration payable; and so long as he remains ready to do whatever else is to be done to give the vendee the benefit of his purchase, he is entitled to receive the agreed price without deduction on account of his retention of his lien upon the property").[12]

Here, Circuit City performed its obligations with respect to delivery when the sale was entered as an alternative location sale into Circuit City's DPS system and the purchased merchandise was "reserved" for the customer at the designated location. It was the customer from that point on who assumed responsibility for acquiring physical receipt of the purchased

clearly distinguish between "delivery," "physical possession," and "receipt" of goods. See § 2-103 (1) (*e*) (defining delivery as "the voluntary transfer of physical possession or control of goods") and (*l*) (defining receipt as "taking physical possession of [goods]").

[12]Definitions of the word "delivery" found in Black's Law Dictionary also favor this approach. That text defines "delivery" as the "giving or yielding possession or control of something to another" and provides that "symbolic delivery" or constructive delivery of the subject matter of a sale may be made by the "actual delivery of an article that represents the item, that renders access to it possible, or that provides evidence of the purchaser's title to it, such as the key to a warehouse or a bill of lading for goods on shipboard." Black's Law Dictionary 440 (7th ed. 1999).

merchandise. The time of such receipt was placed by Circuit City within the customer's control and packaged as a sales option offered as part of Circuit City's over-all philosophy to "wow the customer." See 3A R.A. Anderson, Uniform Commercial Code § 2.401.90 (3d ed. rev. 2002) (seller always obligated to deliver goods, but performance of this duty may range from merely making goods available to buyer, shipping goods to buyer, delivering goods at specified destination, making delivery of documents of title, or transferring title without delivery of goods or documents).

It is clear that, under the UCC, no title can pass under a contract for sale "prior to their identification to the contract." G. L. c. 106, § 2-401 (1). This was also true in common law. See *G.E. Lothrup Theatres Co.* v. *Edison Elec. Illuminating Co.*, 290 Mass. 189, 193 (1935) ("title cannot pass until goods are set apart and appropriated to the contract"). We reject, however, Circuit City's argument that "identification to the contract" cannot be made in alternative location sales prior to the time that the merchandise is physically removed from inventory and the serial number is scanned in the New Hampshire store.[13] The reserve notation marked on the customer sales receipt for the purchased merchandise sufficiently reflects its status of being set aside, or identified, to that particular transaction.[14] The Circuit City district manager described the reserving system as moving merchandise to a "phantom" location to await customer pick up, and, indeed, the situation presented to the customer is just as though the merchandise actually is set aside and waiting

[13]This argument relies, in part, on Circuit City's assumption of the risk of loss on the purchased merchandise until the time that it is handed over to the customer. Section 2-509 of the UCC, however, bases risk of loss on the physical location of the goods, irrespective of whether title has already passed to the buyer. As a merchant subject to art. 2 of the UCC, Circuit City cannot transfer the risk of loss until the customer's actual receipt of the goods, even though full payment has been made and the buyer has been notified that the goods are at his disposal. See G. L. c. 106, § 2-509 (3); official comment 3 to § 2-509, 1A U.L.A. 777 (Master ed. 1989).

[14]The district manager testified that, although a store manager has the ability manually to override the DPS system in order to sell the reserved merchandise to a different customer prior to pick up, such action is counter to company policy and would create "a nightmare."

for the customer at the pick-up counter. The purchased merchandise in the alternative location sales at issue is, by its nature, fungible.[15] Because customers do not choose items in a store such as Circuit City by a particular serial number, but only by make and model, identification by serial number is unnecessary to the sale. See *Chokel* v. *First Nat'l Supermarkets, Inc.*, 421 Mass. 631, 637 (1996); *Cushing* v. *Breed*, 14 Allen 376, 380 (1867).

Based on the principles expressed above, we reject Circuit City's attempt to portray the alternative location sales at issue as exempt from G. L. c. 64H, § 2, by virtue of falling within one or both of two statutory exclusions. The first, G. L. c. 64H, § 1, specifically excludes from the statutory definition retail sales "in which the only transaction in the commonwealth is the mere execution of the contract of sale in which the tangible personal property sold is not in the commonwealth at the time of such execution." Although the merchandise was physically located in New Hampshire at the time of its purchase, far more than the "mere execution of the contract of sale" took place in Massachusetts: the buyer and the seller were in Massachusetts at the time of purchase, and, as has been discussed, title to the purchased goods passed there.

The second statutory exclusion claimed by Circuit City is set forth in G. L. c. 64H, § 6 (*b*), which exempts from the sales tax "[s]ales of tangible personal property . . . which the vendor is obligated under the terms of any agreement to deliver (1) to a purchaser outside the commonwealth or to a designee outside the commonwealth of a purchaser outside the commonwealth or (2) to an interstate carrier for delivery to a purchaser outside the commonwealth or to a designee outside the commonwealth of a purchaser outside the commonwealth." By its plain language, G. L. c. 64H, § 6 (*b*), applies only to transactions where terms of a sales agreement obligate a vendor to deliver its merchandise to a purchaser (or a purchaser's designee) who is outside

---

[15]The UCC defines "[f]ungible" goods as "goods . . . of which any unit is, by nature or usage of trade, the equivalent of any other like unit." G. L. c. 106, § 1-201 (17).

Massachusetts.[16] There was no such scenario in this case. As has been explained, Circuit City performed its obligations with respect to delivery of the purchased merchandise at the time the merchandise was reserved for customer pick up and when the customer was in Massachusetts. The terms of the sales agreement did not require Circuit City physically to transport merchandise to a customer, or a customer's designee, in New Hampshire by its own vehicle or by interstate carrier. See *Clark Franklin Press Corp.* v. *State Tax Comm'n*, 364 Mass. 598, 603-604 (1974) (holding also that "the plain meaning of § 6 [b] is that an exemption applies only when the direct purchaser . . . is located outside of Massachusetts").[17] See also *George S. Carrington Co.* v. *State Tax Comm'n*, 375 Mass. 549, 551 (1978) (sales tax imposed on out-of-State delivery because taxable event [delivery to post office] occurred in Massachusetts).[18] We conclude that the alternative location sales in issue were taxable in Massachusetts under G. L. c. 64H, § 2.

As a final matter, we reject Circuit City's claim that the board ignored evidence with respect to the "national scope" of

---

[16]This court is not bound by a preliminary statement that may have been made in a letter sent to Circuit City by the Department of Revenue indicating that the application of a literal reading of G. L. c. 64H, § 6 (*b*), might exempt the alternative location sales at issue from excise.

[17]This interpretation is in accord with that of the department. See 830 Code Mass. Regs. § 64H.6.7 (1993) (§ 6 [*b*] applies when purchaser of property is outside of Massachusetts at the time the order for the property is placed).

[18]Any similarity of this case to one recently considered by the board in *Neiman Marcus Group, Inc.* v. *Commissioner of Revenue*, 26 Mass. App. Tax Bd. Rep. 316 (2001), is superficial only. The facts of that case involved sales by a Massachusetts retail store to customers physically present in Massachusetts, who requested delivery of purchased merchandise to a third-party designee at an out-of-State address. A common carrier conveyed the merchandise from Massachusetts to out-of-State recipients, and the purchaser paid for shipping and handling costs at the time of purchase. The board determined that, because the store was obligated by agreement with the customer to deliver the goods to the designated destination, the sales were not taxable in Massachusetts.

We also do not deal in this opinion with a situation where a Massachusetts store has a branch store located in another State that, at a customer's request, ships taxable tangible personal property to Massachusetts residents. Nor do we deal with a situation where a customer in Massachusetts purchases merchandise from a Massachusetts store and, at the customer's request, has it shipped to the customer at an address in another State (e.g., the customer's vacation home), where it is collected by the customer and returned to Massachusetts.

its alternative location sales procedure. The fact that Circuit City chose to program its DPS system (albeit on a nationwide basis) to compute sales tax according to the State where customer pick up occurs is wholly irrelevant to the question we are asked to decide, whether sales tax is due on those sales under Massachusetts law. Circuit City presents no evidence to support its assertions that other national retail chains base taxability of sales in a likewise manner or that Massachusetts is now "out of sync" with other taxing jurisdictions.[19]

"It is a settled principle of our taxation jurisprudence that tax statutes are 'to be construed as imposing taxes with respect to matters of substance and not with respect to mere matters of form.' *Green* v. *Commissioner of Corps. & Taxation*, 364 Mass. 389, 394 (1973), quoting *Commissioner of Corps. & Taxation* v. *Second Nat'l Bank*, 308 Mass. 1, 6 (1941)." *Commissioner of Revenue* v. *J.C. Penney Co.*, 431 Mass. 684, 688 (2000). In construing other terms of our tax statutes, we have "reject[ed] a technical construction . . . that would permit vendors to escape sales and use tax liability by artful drafting." *Commissioner of Revenue* v. *Jafra Cosmetics, Inc.*, 433 Mass. 255, 261 (2001). See *Clark Franklin Press Corp.* v. *State Tax Comm'n, supra* at 603. The transactions here involved sales to customers who were within the Commonwealth at the time of purchase. Circuit City credited the sales to the Massachusetts stores and the sales representative in the Massachusetts store received a commission on the sale. The sales occurred in Massachusetts and were taxable here.

3. There may remain unresolved matters with respect to Circuit City's tax liability for the tax period at issue. The board

---

[19]Appellate decisions from other jurisdictions cited by Circuit City in support of its position that the alternative location sales at issue are not taxable in Massachusetts are instantly distinguishable because the sales in those cases, unlike alternative location sales, involve physical movement of merchandise to another State. See *Department of Revenue* v. *United States Sugar Corp.*, 388 So. 2d 596, 597 (Fla. Dist. Ct. App. 1980); *Bloomingdale Bros., a Div. of Federated Dep't Stores, Inc.* v. *Chu*, 76 N.Y.2d 218, 222 (1987), citing *C.G. Gunther's Sons* v. *McGoldrick*, 279 N.Y. 148 (1938); *Hales Sand & Gravel, Inc.* v. *Audit Div. of State Tax Comm'n*, 842 P.2d 887, 892 (Utah 1992). See also *PPG Indus., Inc., Trucking Div.* v. *Lindley*, 1 Ohio St. 3d 212, 213-214 (1982) (at time of sale, trucks already in possession of out-of-State buyer and parties agreed title would pass in Michigan).

determined that it was not until April, 1995, that Circuit City programmed its DPS system to isolate receipts from alternative location sales and determine taxability of those sales based on the location where the item would be released to the customer. During the quarterly period beginning on April 1, 1993, through the period ending on March 31, 1995, Circuit City apparently was still remitting five per cent of all sales attributable to its Massachusetts stores, regardless of the location at which the merchandise was released to the customer. The board determined that, during this time, Circuit City (unwittingly) remitted $91,866.88 of Massachusetts sales tax on alternative location sales originating in Massachusetts. The record also indicates that, during the audit period, Circuit City may have collected and remitted to the commissioner excise from alternative location sales initiated out of State but concluded by customer pick up at a Massachusetts store.

Any amount of credit owed to Circuit City based on tax payments remitted to the Commonwealth during the tax period at issue is a matter to be determined by the commissioner on the bringing of an application for abatement by Circuit City pursuant to G. L. c. 62C, § 37.

4. The board's decision is affirmed.

*So ordered.*