# United States Court of Appeals
## For the First Circuit

No. 15-1954

CNE DIRECT, INC.,

Plaintiff, Appellant,

v.

BLACKBERRY CORPORATION, f/k/a RESEARCH IN MOTION CORPORATION,

Defendant, Appellee,

ASSET RECOVERY ASSOCIATES WORLDWIDE, LTD.

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Thompson and Kayatta, Circuit Judges,
and Mastroianni,* District Judge.

Jack Irving Siegal, with whom William C. Nystrom, Dana A. Zakarian, and Nystrom Beckman & Paris LLP, were on brief, for appellant.
Sanford F. Remz, with whom Noemi A. Kawamoto, Donald K. Stern, and Yurko, Salvesen & Remz P.C., were on brief, for appellee.

* Of the District of Massachusetts, sitting by designation.

May 2, 2016

**KAYATTA**, **Circuit Judge**.  CNE Direct, Inc. ("CNE") is a Massachusetts corporation in the business of buying and reselling bulk technological components.  In November 2013, CNE reached an agreement with Asset Recovery Associates Worldwide, Ltd. ("Asset") to purchase phone parts manufactured by BlackBerry Corporation ("BlackBerry").  Asset thereafter failed to make the parts available at the agreed-upon price, causing CNE to suffer a substantial loss in connection with its own commitment to resell the parts to other parties.  In addition to suing Asset, CNE seeks to hold BlackBerry itself liable, contending that Asset was acting as BlackBerry's actual or apparent agent in the November 2013 transaction.  After each party marshalled its best evidence following full discovery, and after entering default judgment against the now-defunct Asset, the district court entered summary judgment in favor of BlackBerry.  CNE Direct, Inc. v. BlackBerry Corp., No. 14-cv-10149-FDS, 2015 WL 4750847, at *6, *11 (D. Mass. Aug. 10, 2015).  After considering CNE's appeal, we affirm.

## I.   Background

As this is an appeal from a grant of summary judgment, we recite the facts in the light most favorable to CNE, the non-movant, and draw all reasonable inferences in its favor.  See Martinez v. Petrenko, 792 F.3d 173, 175 (1st Cir. 2015).

On October 25, 2013, Asset received an email from BlackBerry stating that it was "looking to move" excess memory

parts and listing its excess units. Asset forwarded the email to CNE. CNE thereafter entered into discussions with Asset on the terms pursuant to which Asset would supply the BlackBerry parts to CNE. According to CNE, CNE and Asset eventually reached agreement on the terms of a sale. CNE then sent Asset a purchase order to confirm the agreed-upon deal. The purchase order identified Asset as the "supplier" of the parts and stated the agreed-upon price. Asset then backtracked, first demanding a price increase of approximately 2%, then an increase of approximately 28%. CNE claims that Asset's back-tracking was an orchestrated attempt by BlackBerry to take advantage of CNE's "position of weakness." CNE complained to Asset, and also sought intercession by BlackBerry, which declined.

As we will discuss, there was nothing about the foregoing transaction and dealings in October and November 2013 that would support an argument that Asset acted as an actual or apparent agent of BlackBerry. As CNE points out, though, it had prior dealings with Asset for the purchase and sale of BlackBerry parts. Those prior dealings, CNE argues, provide a course of conduct, or at least context, sufficient to cast the aborted November 2013 transaction in a different light. So we turn to consider those prior dealings.

In May 2011, Christopher Tejeda, then a trader at CNE, first called BlackBerry to inquire about purchasing excess

- 4 -

inventory. He reached Chris Efstathiou, the individual responsible for managing BlackBerry's excess inventory. During their initial phone conversation, Efstathiou told Tejeda that if he wanted to purchase BlackBerry's excess inventory, he should speak to Stephen Miele, the individual in control of Asset. At the time, Asset was one of many third-party resellers to which BlackBerry sold its excess inventory. CNE suspected this was the case by October 2012 and knew it to be true by October 2013, notwithstanding Miele's best efforts to hold himself out as the "exclusive" source of BlackBerry parts or as BlackBerry's "agent" and BlackBerry's apparent lack of interest in helping to connect CNE with a different inventory reseller.

CNE thereafter dealt with Miele. An initial phone call between Tejeda and Miele in May 2011 led to additional conversations regarding the available BlackBerry parts and negotiations over CNE's bid for the parts. Once CNE and Asset reached an agreement, CNE prepared a "purchase order" to confirm the purchase price, listing a company affiliated with Asset as the supplier. When Asset passed this documentation along to BlackBerry, BlackBerry objected and asked that it instead be listed as the supplier. CNE changed the purchase order form to accommodate this request, received an invoice from BlackBerry in return, and wired the funds directly to BlackBerry. BlackBerry, in turn, paid Asset a five percent commission on the sale.

- 5 -

The next relevant transaction, in August 2011, followed a slightly different course. Viewing the record most favorably to CNE, it appears that BlackBerry first passed along a list of its on-hand excess inventory to Asset. Asset disseminated the lists to its customers, including CNE, seeking per-unit bids. Asset then collated the bids it received and shared the amounts of bids and identities of the bidders with BlackBerry, profiting by reserving for itself a markup on the products that varied between approximately 10% and 50% of the bid.[1] No written agreement governed the terms of Asset's relationship with BlackBerry, though the parties operated under an understanding that BlackBerry retained the right to refuse to sell to Asset based on the amount it was willing to pay for the parts or the identity of the intended downstream purchaser.[2]

Once CNE placed its bid with Asset and BlackBerry had informed Asset that the bid was acceptable, CNE confirmed the transaction by issuing to Asset a purchase order memorializing the agreed-upon price. Asset then remitted a "pro forma" invoice to confirm the exact quantity of goods that would be sold. As with the original transaction, CNE's purchase order identified BlackBerry as the supplier. Unlike the first transaction, CNE did

---

[1] CNE knew that this was how Asset profited.
[2] For obvious reasons, BlackBerry preferred to avoid selling excess parts to its competitors.

not pay BlackBerry but instead wired funds to Asset or its affiliates.

Between August 2011 and August 2012, the parties conducted seven transactions for BlackBerry parts that followed this pattern and amounted to approximately $836,000. At no point in the parties' dealings did Asset take physical possession of the goods. Rather, CNE retrieved the parts at BlackBerry's warehouse.

Over time, CNE grew frustrated with Miele's conduct. On August 30, 2012, CNE emailed BlackBerry and expressed frustration with Miele. On October 23, 2012, CNE emailed BlackBerry to complain about Miele's lack of professionalism. CNE at that point had determined that Miele was untrustworthy and had lied to CNE repeatedly. BlackBerry's response, from a new manager who had taken over BlackBerry's dealings with Asset, characterized CNE's acquisition of the parts as involving two transactions, one between BlackBerry and Asset, and a second between Asset and CNE. Consistent with this characterization, the emailed response concluded as follows:

> As for professional business standards, the purchase of the LCD's was between you and Stephen and that is the forum that should be maintained is it not? Sorry, but I don't wish to get in the middle between yourself and Stephen as relationships are important to myself and RIM as a whole. I suggest you need to deal on this with Stephen. I am not sure how else I can help you in this situation.

When CNE thereafter emailed BlackBerry to try to address Miele's dealings with CNE, BlackBerry called and turned down CNE flatly, telling CNE that it "ha[d] to discuss it with Mr. Miele."

After this conversation, CNE and Asset entered into one additional transaction in 2012. Then, in August 2013, Miele told CNE to change the supplier listed on future purchase orders to Asset, rather than BlackBerry. CNE did so, and entered into at least six additional transactions totaling approximately $730,000 following this new practice prior to the aborted November 2013 transaction. During this time, BlackBerry and Asset appear to have had no further communication, save, perhaps, brief exchanges relating to the logistics of picking up inventory at BlackBerry's warehouse. Asset occasionally interfaced with BlackBerry to facilitate pickup on CNE's behalf. In one October 2013 email sent by Catherine Miele--Stephen Miele's wife and apparently an Asset employee--to BlackBerry, she explained that "[Asset] ordered the parts . . . . I sold the parts to CN Direct [sic] and they are sending their trucker to pick up the parts."

## II. Analysis

We review a district court's grant of summary judgment de novo. Martinez, 792 F.3d at 179. The moving party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The parties agree that Massachusetts law governs. "[T]he question of agency," the Massachusetts Supreme Judicial Court has held, "is usually an issue for the fact finder," but summary judgment can be appropriate if the party asserting the existence of an agency relationship "fail[s] to advance specific facts sufficient to establish the existence of a genuine issue of material fact as to [the putative agent's] actual or apparent authority to act on behalf of [the principal]." Theos & Sons, Inc. v. Mack Trucks, Inc., 729 N.E.2d 1113, 1119 (Mass. 2000).

Massachusetts follows the Second Restatement view of principal-agent relationships, "the essential ingredients" of which are:

> 1) the agent's power to alter the legal relationships between the principal and third parties; 2) a fiduciary relationship toward the principal regarding matters within the scope of the agency; and 3) the principal's right to control the agent's conduct in matters within the scope of the agency.

Sorenson v. H & R Block, Inc., 107 F. App'x 227, 231 (1st Cir. 2004) (unpublished) (citing, inter alia, Restatement (Second) of Agency §§ 12-14 (1958)). According to Massachusetts courts, particularly salient among these criteria is the principal's right to control. See Spencer v. Doyle, 733 N.E.2d 1082, 1086 (Mass. App. Ct. 2000) (an "essential characteristic of agency is the right

- 9 -

of the principal to control what the agent shall or shall not do before the agent acts" (internal quotation omitted).[3]

CNE argues that, as an agent, Asset was cloaked with both actual and apparent authority to bind BlackBerry, its principal, in contract. We address each argument in turn.

## A. Actual Authority

Actual authority is a product of "mutual consent, express or implied, that the agent is to act on behalf and for the benefit of the principal, and subject to the principal's control." Theos & Sons, 729 N.E.2d at 1119. CNE points to no evidence of any express consent manifested by both Asset and BlackBerry. Rather, it argues that there was an implied agreement pursuant to which BlackBerry authorized Asset to act on behalf of BlackBerry in agreeing to sell parts to CNE. See id. at 1120 n.13 ("Implied authority is actual authority that evolves by implication from the conduct of the parties." (citing T. D. Downing Co. v. Shawmut Corp., 139 N.E. 525, 526 (Mass. 1923))).

In support of this argument, CNE points only to representations by Miele that he had secured an agreement with BlackBerry that Asset would find buyers and that BlackBerry would

_____

[3] Under Massachusetts law, "the principal need not in fact exercise that control" over an agent. DiMaria v. Concorde Entm't, Inc., No. 12-cv-11139-FDS, 2014 WL 991567, at *4 (D. Mass. Mar. 12, 2014). Rather, "the crucial inquiry is whether [it] has a right to control." Id.

- 10 -

simply pay Asset a 5% finder's fee. After June 2011, however, there is zero evidence that BlackBerry ever entered into such an agreement, impliedly or otherwise. To the contrary, the transaction at issue in November 2013 (and at all points other than in June of 2011) involved no finder's fee, leaving Asset with the upside or downside of any spread between what it agreed to pay BlackBerry and what CNE agreed to pay it. In this respect, the fact that Miele unsuccessfully sought to proceed on a fixed commission basis rebuts rather than supports any claim that there was an implied agreement that Asset act as BlackBerry's agent. See T. D. Downing Co., 139 N.E. at 526 (declining to find an implied principal-agent relationship when "[t]he risks of . . . the contracts between the two were wholly with the [putative agent] to whom alone the profits would accrue").

CNE further argues that BlackBerry's control over Asset was such that Asset acted as a "mere conduit for the passing of prices [and] terms between Blackberry and CNE." BlackBerry's "control" over Asset's operations extended to, at most, the ability to decline to sell Asset its excess inventory if the price Asset named was not high enough or if Asset stated that it planned to resell the parts to one of BlackBerry's competitors or to a customer in a foreign country controlled by a loathsome regime. These basic commercial ground rules, "merely reflective of the ordinary desire of manufacturers to set sufficient minimum

- 11 -

performance and quality standards to protect the good name of their trademark," simply do not approach the "kind of close control" a principal would be expected to assert over an agent's operations. Theos & Sons, 729 N.E.2d at 1120; see also Brown-Forman Corp. v. Alcoholic Beverages Control Comm'n, 841 N.E.2d 1263, 1269-71 (Mass. App. Ct. 2006) (finding that an alcohol distributor was not the agent of a wholesaler even though the wholesaler had veto power over the distributor's marketing plan and pricing structures).

**B.    Apparent Authority**

We turn, therefore, to CNE's primary argument:  That Asset acted with apparent authority on behalf of BlackBerry. Unlike actual authority, apparent authority need not find its provenance in an agreement between the agent and the principal. Rather, apparent authority arises when the principal, here BlackBerry, says or does something that, "reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him."  Theos & Sons, 729 N.E.2d at 1120 (quoting Restatement (Second) of Agency § 27).

CNE correctly notes that the parties' prior "course of dealing" is relevant to ascertaining the existence of apparent authority.  Binkley Co. v. E. Tank, Inc., 831 F.2d 333, 337 (1st Cir. 1987); see generally Mass. Gen. Laws ch. 106, § 1-303(b) ("A 'course of dealing' is a sequence of conduct concerning previous

transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting the parties' expressions and other conduct."). Pointing to the parties' prior transactions here, CNE fairly argues that a factfinder could reasonably conclude that, given the origin of the transactions in 2011, and given BlackBerry's request that the purchase orders list BlackBerry as the supplier, CNE could have reasonably formed a belief that BlackBerry was its counterparty, with Asset acting only as BlackBerry's selling agent.

The problem for CNE, though, is that the subsequent emails and phone conversation in October 2012 constituted an obvious and express clarification that should have disabused CNE of relying on any such view of the respective relationships. Cf. Hudson v. Mass. Prop. Ins. Underwriting Ass'n, 436 N.E.2d 155, 159 (Mass. 1982) (apparent authority conferred by "conduct by the principal [that] causes a third person reasonably to believe that a particular person has . . . [such] authority" (citation omitted)); see generally Restatement (Second) of Agency, § 8 cmt. c ("Apparent authority exists only to the extent that it is reasonable for the third person . . . to believe that the agent is authorized."). In light of the October 2012 communications, the reasonableness of any belief that BlackBerry held out Asset as its agent would have been tenuous at best. See, e.g., Moreau v. James

River-Otis, Inc., 767 F.2d 6, 10 (1st Cir. 1985) (applying Second Restatement view, inference of apparent authority unreasonable where only manifestation by international union that it could be bound by its local representatives was its signature on a master collective bargaining agreement); Theos & Sons, 729 N.E.2d at 1121-22 (inference of apparent authority unreasonable where third party relied on presence of would-be principal's logo and name displayed on putative agent's invoices and in its place of business, in addition to statements by made by putative agent). Our dissenting colleague nevertheless posits that perhaps CNE interpreted BlackBerry's October 2012 you-deal-with-Asset directives as simply indicating that BlackBerry, as supplier, had in-house and outside agents, and CNE need deal with the latter. While we find it difficult to read the communications in context in this manner, the simpler point is that CNE thereafter changed the order forms to list Asset as its supplier. There is simply no reasonable basis to claim that CNE thereafter viewed BlackBerry as its supplier.[4]

CNE, lastly, points out that Asset never took physical possession of the goods in question and was a "one-man operation" run from Miele's offices, lacking warehouses of its own. It was

---

[4] We need not weigh conflicting evidence on an ambiguous record to reach this conclusion. Rather, we are simply recognizing that, whatever ambiguity may have existed prior to 2013, the logic of chronology and subsequent events rendered any earlier ambiguity irrelevant to ascertaining the identity of CNE's putative counterparty in that aborted 2013 deal.

clear to CNE, nevertheless, that in reselling BlackBerry's excess inventory, Miele "act[ed] in his own name and receive[d] the title to the property which he thereafter [was] to transfer." Restatement (Second) of Agency § 14K cmt. a.  Nor is there any reason why title to the inventory could not pass from BlackBerry to Asset, and then from Asset to CNE, while the inventory remained at BlackBerry's warehouses.  See Circuit City Stores, Inc. v. Comm'r of Revenue, 790 N.E.2d 636, 641 (Mass. 2003) (title to goods may pass even though goods remain in physical possession of vendor).  The fact that Miele did not take on the risk of damage or loss under U.C.C. § 2-509 sheds no relevant light in this context on the question of agency.  In short, nothing about the size or manner of his operation belied the fact that BlackBerry did not hold him out as its agent in negotiating the aborted deal.

These findings have particular force given that CNE is a commercially sophisticated "third party of reasonable prudence in the [same] business" as Asset.  Binkley, 831 F.2d at 337.  This is not to say that CNE must have assumed Asset's relationship with BlackBerry to parallel CNE's with its customers.  Rather, it is to point out that sophisticated commercial parties operate in a world in which the terms of commercial forms exchanged with one another are customarily controlling.  See U.C.C. § 2-207(2).  The controlling forms here made clear that CNE and Asset shared a nearly identical business model:  buy products in bulk from

- 15 -

manufacturers and re-sell them to other customers in other markets "downstream."  Just as CNE, not Asset, supplied CNE's customers; Asset, not BlackBerry, supplied CNE.

### III. Conclusion

The arrangement between these sophisticated parties during the relevant time period was that CNE dealt only with Asset, that CNE listed Asset and not BlackBerry as the supplier, and that CNE paid only Asset, all in accord with BlackBerry's express rejection of CNE's request that it exercise some control over Asset.  On such a record, no fact finder could rationally conclude that BlackBerry gave CNE reason to think that Asset was acting as BlackBerry's agent in negotiating the price of the aborted November 2013 deal.  The district court's ruling is affirmed.


**-Dissenting Opinion Follows-**

THOMPSON, **Circuit Judge, dissenting in part**. While I agree with the majority's conclusion on the actual authority question, I dissent from its holding as to apparent authority.

On our de novo review of a summary judgment motion, the court is to view the record in the light most favorable to the non-moving party, in this case CNE, and draw all inferences in its favor. Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). In other words, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). But this is exactly what the majority has done. The majority opinion has laid out the facts that, on one hand, would establish apparent authority, and those that, on the other, would suggest there was none. The majority has then concluded that the second set of facts outweighs the first, and that CNE could not have believed Asset Recovery was BlackBerry's agent. But I think a reasonable jury could come out the other way, and summary judgment is therefore not proper here.

An agency relationship exists by way of apparent authority where the putative principal's conduct led a "third party of reasonable prudence in the business to rely on the agent's authority." Binkley Co. v. E. Tank, Inc., 831 F.2d 333, 337 (1st Cir. 1987); see also Theos & Sons, Inc. v. Mack Trucks, Inc., 729 N.E.2d 1113, 1121–22 (Mass. 2000). Viewing the record before us,

- 17 -

I think a jury could conclude that CNE believed, based on a reasonable interpretation of BlackBerry's conduct, that Asset Recovery was BlackBerry's agent.

The record shows that CNE originally reached out to BlackBerry in order to buy its bulk technological parts, and that it was BlackBerry that referred CNE to Asset Recovery. During CNE's first transaction for the purchase of the parts, CNE's purchase order listed a company affiliated with Asset Recovery as the supplier, but BlackBerry explicitly directed CNE to change its purchase order to list BlackBerry as the supplier. CNE also wired payment for the parts directly to BlackBerry, and then picked up the parts directly from a BlackBerry warehouse. After this first payment, CNE began to make payments to Asset Recovery, but for at least seven subsequent transactions it remained the practice that BlackBerry was listed as the supplier on the purchase orders, and that CNE always picked up the products from BlackBerry.

Up until this point, it appears the majority and I are in agreement that it would be fair to argue that a factfinder could find that CNE reasonably believed, based on this course of dealing, that Asset Recovery was BlackBerry's agent. According to the majority, however, the conversations between CNE and BlackBerry in October 2012 change everything.

The October 2012 communications to which the majority refers consist of an email and subsequent phone call, in which

- 18 -

BlackBerry refused CNE's request that it get involved in CNE and Asset Recovery's souring relationship. Specifically, in late August 2012, CNE wrote to BlackBerry to complain that it could not "do business through this channel anymore" -- the "channel" being Stephen Miele of Asset Recovery. As disagreements between CNE and Asset Recovery continued, CNE wrote to BlackBerry again in October 2012, and in response, a BlackBerry representative told CNE: "Sorry, but I don't wish to get in the middle between yourself and Stephen as relationships are important to myself and RIM as a whole. I suggest you need to deal on this with Stephen. I am not sure how else I can help you in this situation . . . ." The BlackBerry representative then reiterated in a subsequent phone call that BlackBerry would not get involved.

It is the majority's position that these communications made it irrefutably clear that Asset Recovery was not BlackBerry's agent, and that no jury could conclude otherwise. I beg to differ. At the summary judgment stage, we are to view the facts in the light most favorable to CNE, and draw all inferences in its favor. It is certainly true that one way to interpret those emails would be to conclude that BlackBerry refused to get embroiled in the spat between CNE and Asset Recovery because Asset Recovery was an independent actor and not BlackBerry's agent. It would be equally reasonable, however, to conclude that BlackBerry refused to get involved simply because it did not want to undermine the decisions

- 19 -

that one of its agents had made in handling customer business that fell within the scope of that agent's authority. Both interpretations are plausible.

The majority may be right that the first of these interpretations is more convincing, and that it was made more convincing when a year later, in August 2013, Stephen Miele directed CNE to change the purchase orders once again, this time to list Asset Recovery as the supplier. But when there is this kind of toss-up at the summary judgment stage as to how the evidence should be weighed, or which interpretation of the evidence is more plausible, the question must go to a jury. In this case, the question of whether the later October 2012 communications disabused CNE of any notion that Asset Recovery was BlackBerry's agent is a question that requires such weighing and interpreting of evidence. To decide it ourselves would be to engage in an exercise that we are not permitted at the summary judgment phase, and would preclude CNE from exercising its constitutional right to a trial by jury.

Finally, I briefly address the majority's point that CNE is a "commercially sophisticated" party whose business model (i.e., buying and reselling bulk parts) was nearly identical to that of Asset Recovery. The majority seems to suggest that because CNE conducted its own business autonomously, and not on behalf of any principal, CNE should have known that Asset Recovery was also

an independent actor and not an agent of BlackBerry. I am not certain I agree. Why could it not be the case that one company conducted its business independently and another conducted the same business as an agent of a principal? Regardless, to the extent that it is relevant that CNE and Asset Recovery were engaged in the same business, this is, again, something for the jury to weigh, along with the rest of the evidence, in determining whether it was reasonable for CNE to believe that Asset Recovery was BlackBerry's agent.

For these reasons, I respectfully dissent from the majority's holding as to the question of apparent authority.