SOMERSET IMPORTERS, LTD. *vs.* ALCOHOLIC BEVERAGES
CONTROL COMMISSION & another.[1]

No. 88-P-923.

Suffolk. December 13, 1989. - March 19, 1990.

Present: KASS, CUTTER, & FINE, JJ.

*Alcoholic Liquors*, Wholesaler, Supplier. *Administrative Law*, Agency's
interpretation of statute, Findings.

The Alcoholic Beverages Control Commission correctly determined that
"refusal to sell," within the meaning of G. L. c. 138, § 25E, defining an
unfair trade practice in the wholesale alcoholic beverages sales business,
means a material curtailment of the volume of sales made in the regu-
lar course of business, as well as an entire discontinuance of sales. [383-
385]

Sufficient facts and adequate subsidiary findings supported the conclusion
of the Alcoholic Beverages Control Commission that a liquor whole-
saler's order of a certain brand of gin was consistent with its regular
course of business and that the distributor was able to fill the order.
[385-387]

Lawful sales of a certain brand of gin by one wholesaler of alcoholic bever-
ages to another could not, under G. L. c. 138, § 25E, be a basis for the
supplier to refuse to sell that liquor to the wholesaler. [387]

The Alcoholic Beverages Control Commission properly ordered a supplier
of alcoholic beverages to continue to fill a wholesaler's order for a cer-
tain brand of gin, based on a percentage of the highest total yearly
order in the preceding four calendar years. [387-388]

CIVIL ACTION commenced in the Superior Court Depart-
ment on January 22, 1986.

The case was heard by *John C. Cratsley*, J.

*Gerald J. Caruso* for the plaintiff.

*Robert S. Frank, Jr.*, (*Tracy L. Walden* with him) for
New England Liquor Sales Co., Inc.

*Douglas H. Wilkins*, Assistant Attorney General, for Al-
coholic Beverages Control Commission.

[1]New England Liquor Sales Co., Inc.

KASS, J. What produced the controversy is that Somerset Importers, Ltd. (Somerset), refused to sell to New England Liquor Sales Co., Inc. (New England), as much Tanqueray gin, a brand name product, as the latter wanted to buy. This raised the question whether, within the meaning of G. L. c. 138, § 25E, the statutory phrase "refusal to sell" means a partial curtailment of sales as well as an entire discontinuance of sales.

The Alcoholic Beverages Control Commission (ABCC) concluded that the limitation on quantity which Somerset sought to impose transgressed the statute and ordered that Somerset sell to New England in any year up to 110% of the highest annual quantity of Tanqueray gin which New England had bought in the preceding four calendar years.[2] On review under G. L. c. 30A, § 14, a judge of the Superior Court affirmed the administrative agency decision. Neither party was content with the judgment and both have appealed; Somerset is aggrieved that it is required to sell too much Tanqueray and New England is aggrieved that Somerset is not required to sell enough, viz., however much New England desires to buy. We affirm.[3]

---

[2]The ABCC had issued an interim order in April, 1985, which required Somerset to fill New England's orders for Tanqueray gin. The final order, dated December 28, 1985, read: "After hearing, the Commission reiterates its order that for calendar year 1985 Somerset fill all Tanqueray Gin orders from New England Sales at the prices in effect on the dates that the orders are or were received by Somerset, provided Somerset is not obligated to ship to New England in any quantity (in any size available throughout the years 1981-1984) greater than the highest calendar year total of that size ordered by New England Sales during 1981-1984.

"Further, the Commission orders for calendar year 1986 and future years, that the maximum quantity that Somerset shall be required to sell to New England shall be 110% of the highest calendar year total, by size, sold to New England by Somerset in the preceding four calendar years."

[3]In addition to seeking review under the State Administrative Procedure Act (G. L. c. 30A), Somerset asked for declaratory relief under G. L. c. 231A. The judge dismissed so much of the complaint as asked for a declaratory judgment. Even if a plaintiff is not entitled to the relief sought, a judge acting on a complaint for declaratory judgment should, if there is a controversy, make a binding declaration of the rights of the contending parties. *Building Inspector of Falmouth* v. *Haddad*, 369 Mass.

Here are the material facts leading up to the filing, in April, 1985, of New England's application to the ABCC for relief under G. L. c. 138, § 25E. About a month earlier, New England, a wholesaler, had placed an order for 2,250 cases of Tanqueray.[4] Somerset refused to accept the order on the ground that it was too large, although it invited an "appropriate order" for the 1.75-liter size. In early April, 1985, New England ordered an additional 1,270 cases from Somerset and was turned down, although Somerset shipped 200 cases that were thought necessary to meet the needs of New England's retail customers. There was the rub. New England was selling a major share of its Tanqueray inventory to an affiliated wholesaler, Whitehall Company, Ltd. (Whitehall).[5] Somerset had chosen not to deal with Whitehall and was distinctly less than intoxicated with the diversion of Tanqueray gin to Whitehall via New England. Sales from a licensed wholesaler to another licensed wholesaler are, however, lawful under G. L. c. 138, § 18. Cf. *Beverages Intl., Ltd.* v. *Alcoholic Beverages Control Commn.*, 24 Mass. App. Ct. 708, 708-709 (1987). No clause in the agreement, dated February 1, 1972, under which Somerset agreed to sell to New England, prohibited the sale of beverages by New England to another wholesaler.

1. *"Refusal to sell" within the meaning of § 25E.* Under G. L. c. 138, § 25E, as appearing in St. 1982, c. 627, § 10, it is an "unfair trade practice and therefor unlawful for any . . . importer . . . of any alcoholic beverage to refuse to sell, except for good cause shown, any item having a brand name to any licensed wholesaler to whom such . . . importer . . . has made regular sales of such brand item during a period of six months preceding any refusal to sell." For purposes of the statute, "good cause" for refusing to sell is limited to five grounds set forth in the sec-

---

452, 461 (1976). *Motor Club of America Ins. Co.* v. *All American Rental, Inc.*, 14 Mass. App. Ct. 1031, 1032 (1982).

[4]The bulk of the order was for 1-liter (1,560 cases) and 1.75-liter (400 cases) sizes.

[5]New England, headquartered in Holyoke, is a wholly owned subsidiary of Whitehall, which has its headquarters in Norwood.

ond paragraph of § 25E. See *Seagram Distillers Co.* v. *Alcoholic Beverages Control Commn.*, 401 Mass. 713, 716 (1988); *Union Liquors Co.* v. *Alcoholic Beverages Control Commn.*, 11 Mass. App. Ct. 936, 938 (1981).

It is common ground among the parties that none of the statutory grounds for refusing to sell were in the picture. Rather it is Somerset's position that "to refuse to sell" does not encompass reasonable rationing. New England, Somerset emphasizes, was not denied the Tanqueray gin needed to satisfy orders from retailers. Somerset claims to have declined to fill only those orders which greatly exceeded the monthly orders for past comparable periods. On the basis of language in the first sentence of the second paragraph of § 25E, which speaks of "*discontinuing* sales to such wholesalers" (emphasis supplied), Somerset suggests that "refusal to sell" means a total abrogation of sales.

"Refusal to sell," however, must mean something other than an entire cutting off. Otherwise it would be possible to restrict sales to a symbolic amount which was so small that it would eliminate a wholesaler as a factor so far as a particular brand name product was concerned. A purpose of § 25E, counteracting vertical integration in the liquor distribution business, would be subverted. See *Pastene Wine & Spirits Co.* v. *Alcoholic Beverages Control Commn.*, 401 Mass. 612, 618 (1988); *Seagram Distillers Co.* v. *Alcoholic Beverages Control Commn.*, 401 Mass. at 716. Somerset appears to recognize the weakness of the total refusal to sell theory because it proceeds to restate its position by arguing that it is a termination of the business relationship or constructive termination of the business relationship which § 25E proscribes. Under that less absolute standard it would, nevertheless, be within the power of a distributor to restrict merchandise to a wholesaler so substantially that the competitive position of that wholesaler would be compromised.

The better view, adopted by the ABCC, is that "refusal to sell" marks a material curtailment of the volume of sales made in the regular course of business. A legislative purpose to maintain normal business volume may be inferred by the

interim remedy § 25E provides upon a complaint to the ABCC of unlawful cutback. Pending determination by the ABCC, the distributor is bound "to make sales in the regular course" to the wholesaler. G. L. c. 138, § 25E. An interpretation of § 25E made by the administrative agency charged with administering the statute is one to which we accord weight. *Cleary* v. *Cardullo's, Inc.*, 347 Mass. 337, 343 (1964). *Amherst-Pelham Regional School Comm.* v. *Department of Educ.*, 376 Mass. 480, 491-492 (1978). *Beverages International, Ltd.* v. *Alcoholic Beverages Control Commn.*, 24 Mass. App. Ct. at 711-712. Such is particularly the case when "the details of legislative policy have not been spelled out in the statute." *Howard Johnson Co.* v. *Alcoholic Beverages Control Commn.*, 24 Mass. App. Ct. 487, 491 (1987).

In deciding that a partial refusal to ship an order constituted a violation of § 25E, the ABCC expressly acknowledged that the case might stand otherwise were it commercially impracticable for an importer[6] to fill an order. If inventory at the source were exhausted by a sudden surge in popularity of a product or by disruption in the supply line (e.g., drought, frost, fire, strike, shipwreck) an importer could, presumably, ration its existing stock to its customers on a prorated basis.

The ABCC correctly ruled that § 25E reached partial refusals to fill orders and that it, therefore, had jurisdiction to hear New England's complaint.

2. *Adequacy of the agency's findings.* Assuming sales volume in accordance with the regular course of business as the correct standard under § 25E, Somerset states a backup position: the ABCC's ultimate finding that New England's orders were consistent with quantities it had historically ordered is unsupported by either substantial evidence in the record or subsidiary findings by the ABCC. It is, of course, understood that an administrative agency must make subsidiary findings and state reasons sufficient to enable a reviewing court to judge whether the agency's conclusions and order

---

[6]The other sources of supply which § 25E lists are: manufacturer, winegrower, farmer-brewer, or wholesaler.

were founded in fact and law. See *School Comm. of Chicopee* v. *Massachusetts Commn. Against Discrimination*, 361 Mass. 352, 353-355 (1972); *Charlesbank Restaurant, Inc.* v. *Alcoholic Beverages Control Commn.*, 12 Mass. App. Ct. 879, 880 (1981); *Vinal* v. *Contributory Retirement Appeal Board*, 13 Mass. App. Ct. 85, 92 (1982).

Here there was evidence before the commission in the form of a chart which traced New England's orders for Tanqueray gin from 1981 through 1984. Taking the one-liter size as an example, sales had fluctuated from a high of 3,715 cases in a year to a low of 2,059 cases. Neither amount was strikingly inconsistent with the 1,560 cases of that size which New England had ordered in March, 1985. Somerset urged that the ABCC should look to historic March orders but the commission, within its administrative discretion and special knowledge, was entitled to look to a year's sales as a superior marker of regular course of business. Monthly buying practices were not necessarily consistent. In March, 1983, for example, New England had bought 595 one-liter cases of Tanqueray; in March, 1984, it had bought none. In 1985, the year of the contested March order, there was reason to buy heavily before higher prices took effect the following May 1st. From this evidence, the ABCC could find, as it did, that New England's orders had not been "unreasonably in excess of quantities ordered in the past . . . ."

The finding that New England's order was one which Somerset could practicably fill had support in the absence of any evidence that Somerset could not deliver what had been ordered, as opposed to generalized assertions that New England's large order tended to destabilize the market.

As to sales history and capacity to supply, therefore, there was evidence sufficient to persuade a reasonable mind to conclude that New England's order was consistent with the regular course of business and that Somerset was able to ship. See G. L. c. 30A, § 1(6); *Boylston-Washington, Inc.* v. *Alcoholic Beverages Control Commn.*, 8 Mass. App. Ct. 396, 398 (1979). Although comparatively summary, the decision of the ABCC contained sufficient fact finding and reasoning

to enable a reviewing court to understand the basis on which the agency had acted. See *Pastene Wine & Spirits Co.* v. *Alcoholic Beverages Control Commn.*, 401 Mass. at 617 n.4; *Seagram Distillers Co.* v. *Alcoholic Beverages Control Commn.*, 401 Mass. at 723 n.12. It requires no effort in reading the commission's decision to conclude that it acted neither unreasonably nor arbitrarily. *Fioravanti* v. *State Racing Commn.*, 6 Mass. App. Ct. 299, 302 (1978).

3. *Backdoor sales to Whitehall.* New England's sales to another wholesaler, Whitehall, were not a basis for refusing to fill New England's orders. As previously noted, § 25E expressly limits what is good cause for refusing to ship. Recourse to the venerable "inclusio unius est exclusio alterius" maxim, *Harborview Residents' Comm., Inc.* v. *Quincy Housing Authy.*, 368 Mass. 425, 432 (1975), is not even necessary. The statutory grounds for discontinuance are: disparagement of the product; unfair preferment in sales effort for brand items of a competitor; failure to exercise best efforts in promoting the product; engaging in improper or proscribed trade practices; or failure to comply with the terms of sale agreed upon between supplier and wholesaler. As sales to another wholesaler are not proscribed by § 25E, such sales cannot, without more (e.g., an agreement not to do so), be a basis for a refusal by a supplier to sell. Indeed, as New England had been selling Tanqueray gin to Whitehall for substantially longer than six months, Whitehall would be entitled under § 25E to demand continued sales from New England.

4. *The 110% factor.* Both Somerset and New England attack, as not supported by principle or articulated reasons, that aspect of the ABCC's order which requires Somerset to sell to New England at least 110% of the highest annual volume, by size, sold to New England by Somerset in the preceding four calendar years. While one might have wished more explication from the commission as to how it arrived at the 110% factor, the underlying reasoning is not so mysterious. The statutory prescription in § 25E, as we have seen, is for a flow of inventory conformable with the regular course

of business. Sales figures for 1981-1984, which were before the commission, reveal that the course of business was not static. Over the four-year period Somerset's sales to New England tended to increase from year to year, although the trend was not uniform; sales fell from an aggregate 6,849 cases in 1982 to 3,712 cases in 1983.

By establishing a limit of 110% of the highest sales in the preceding four years, the ABCC took account of the sales history, i.e., regular course of business, and provided for reasonable growth — a phenomenon also to be anticipated in the regular course of business so long as the product was popular. The ABCC's 110% formula is faithful to the statutory design of § 25E to strike a balance between suppliers and wholesalers. See *Seagram Distillers Co. v. Alcoholic Beverages Control Commn.*, 401 Mass. at 716-717. We think that § 25E, the broad regulatory authority of the ABCC over the liquor industry in Massachusetts, *J. & J. Enterprises, Inc. v. Martignetti*, 369 Mass. 535, 538 (1976), and the facts of the case provide a foundation for the 110% formula. Administrative agencies may make policy in adjudicatory proceedings. *Zachs v. Department of Pub. Util.*, 406 Mass. 217, 221 (1989). It would serve no purpose to remand to the ABCC for a further statement of reasons which restated the obvious. See *New Palm Gardens, Inc. v. Alcoholic Beverages Control Commn.*, 11 Mass. App. Ct. 785, 799 (1981).

*Judgment affirmed.*