BROWN-FORMAN CORPORATION *vs.* ALCOHOLIC BEVERAGES
CONTROL COMMISSION.

No. 04-P-1106.

Suffolk. April 8, 2005. - February 6, 2006.

Present: PERRETTA, CYPHER, & GRAHAM, JJ.

*Alcoholic Liquors,* Alcoholic Beverages Control Commission, Wholesaler, Supplier. *Administrative Law,* Judicial review. *Statute,* Construction. *Agency,* What constitutes.

Discussion of G. L. c. 138, § 25E, which makes it an unfair trade practice for a manufacturer or other supplier of alcoholic beverages, absent good cause, to refuse to sell a brand of alcohol to a wholesaler if the manufacturer has made regular sales of such brand to the wholesaler during the preceding six-month period. [499-500]
Statement of the standard of judicial review under G. L. c. 30A of a decision of the Alcoholic Beverages Control Commission. [503-504]
A Superior Court judge correctly reversed a decision of the Alcoholic Beverages Control Commission imputing obligations under G. L. c. 138, § 25E, to require a distributor to make regular sales of a certain alcoholic beverage product to a Massachusetts wholesaler, where the evidence before the commission did not support its finding that a continuing affiliation or agency relationship existed between the distributor and its predecessor, which previously had supplied the product in question to the wholesaler. [506-510]

CIVIL ACTION commenced in the Superior Court Department on April 9, 2003.

The case was heard by *Judith Fabricant,* J., on motions for judgment on the pleadings.

*Louis A. Cassis* for M.S. Walker, Inc.

*Mary E. O'Neal* for the plaintiff.

PERRETTA, J. This appeal concerns a decision of the Alcoholic Beverages Control Commission (commission) in which it concluded on the evidence before it that the Brown-Forman Corporation (Brown-Forman) was required by G. L. c. 138,

§ 25E, to make regular sales of certain alcoholic beverage products to M.S. Walker, Inc. (Walker), a Massachusetts wholesaler of alcoholic beverages licensed under G. L. c. 138, § 18. Brown-Forman appealed the commission's decision to the Superior Court, where Walker was allowed to intervene as a defendant.[1] A Superior Court judge reversed the commission's decision and ordered entry of a judgment in favor of Brown-Forman. Based on our de novo review of the commission's decision on Walker's appeal, we affirm the judgment.

1. *The controlling statute.* General Laws c. 138, § 25E, "makes it an unfair trade practice for a manufacturer (or other supplier), absent good cause, to refuse to sell a brand of alcohol to a wholesaler if the manufacturer has made regular sales of such brand to the wholesaler during the preceding six-month period."[2] *Heublein* v. *Capital Distrib. Co.*, 434 Mass. 698, 699-700 (2001). See *Heineken U.S.A., Inc.* v. *Alcoholic Bevs. Control Commn.*, 62 Mass. App. Ct. 567, 568 n.2 (2004). The statute has been described as "protectionist" legislation, *id.* at 572, enacted, in part, "to redress economic imbalances in the relationship[s between] wholesalers and their suppliers." *Pastene Wine & Spirits Co.* v. *Alcoholic Bevs. Control Commn.*, 401 Mass. 612, 618-619 (1988). See *Seagram Distil. Co.* v. *Alcoholic Bevs. Control Commn.*, 401 Mass. 713, 716-717 (1988).

Obligations imposed by c. 138, § 25E, are particular to a supplier. See *Charles E. Gilman & Sons, Inc.* v. *Alcoholic Bevs. Control Commn.*, 61 Mass. App. Ct. 916, 917-918 (2004). Generally speaking, a supplier is not obligated under § 25E to continue to make sales to those wholesalers with whom an unaffiliated predecessor did business. See *Pastene Wine & Spirits Co.* v. *Alcoholic Bevs. Control Commn.*, 401 Mass. at 616, 619 (alcoholic beverage producer who acquired and

---

[1]The commission has not participated in this appeal.

[2]As amended through St. 1982, c. 672, § 10, G. L. c. 138, § 25E, provides in relevant part that it is "an unfair trade practice and therefor[e] unlawful for any manufacturer, winegrower, farmer-brewer, importer or wholesaler of any alcoholic beverages, to refuse to sell, except for good cause shown, any item having a brand name to any licensed wholesaler to whom [the] manufacturer . . . has made regular sales . . . during a period of six months preceding any refusal to sell."

liquidated its independent importer-supplier and began directly distributing its product did not succeed to importer's § 25E obligations); *Heublein* v. *Capital Distrib. Co.*, 434 Mass. at 699, 701-702 (supplier who acquired all assets and operations related to production and sale of product in arm's-length transaction did not succeed to predecessor supplier's § 25E obligations).

Where, however, a "continuing affiliation or agency relationship" exists between a supplier and its predecessor, the commission has construed c. 138, § 25E, to allow for the imputation of obligations. *Heublein* v. *Capital Distrib. Co.*, 434 Mass. at 706. The commission's approach to the issue is consistent with the court's interpretation of the statute. See *id.* at 706-707 & n.14. The rationale for imputing obligations under § 25E is particularly compelling where the commission finds that a transfer of distribution rights was undertaken primarily for the purpose of evading those obligations imposed by the statute. See *id.* at 704; *Charles E. Gilman & Sons, Inc.* v. *Alcoholic Bevs. Control Commn.*, 61 Mass. App. Ct. at 918.

2. *Background.* J. Wray & Nephew Limited (Wray) is a Jamaican company that produces and sells several varieties of rum beverages collectively referred to as "Appleton Rum."[3] From October, 1994, through December, 1996, Wray distributed Appleton Rum in the United States through its wholly-owned subsidiary, a Delaware corporation named Carriage House Imports Ltd. (Carriage).[4]

In January of 1997, Wray stopped its distribution of Appleton

---

[3]The brand items at issue in the case before us are Appleton Gold Rum, Appleton Estate VX Rum, Appleton Estate 12 Year Old Rum, and J. Wray & Nephew 126 Proof Rum.

[4]We note as an aside that the commission found that as early as 1987, Carriage served as the exclusive United States distributor of Appleton Rum; that in 1987, Carriage was a wholly owned subsidiary of Rums International, Inc. (Rums); and that in 1987, Rums was owned by Richard D'Costa. The commission found, and the record establishes, that before Carriage became a wholly owned subsidiary of Wray in October, 1994, Carriage distributed Appleton Rum in accordance with two interrelated agreements, executed in January, 1993, pursuant to which Wray appointed Carriage to serve as its exclusive distributor in the United States and Rums granted Carriage an exclusive right to use the "Appleton" trademark in connection with the marketing and distribution of Appleton Rum within the United States. There is some, but not overwhelming, evidentiary support for the commission's finding

Rum through Carriage and hired an independent distributor, United Distillers and Vintners (UDV),[5] to serve as the sole importer and distributor of Appleton Rum in the United States. On October 1, 2001, UDV's distributorship of Appleton Rum was terminated by mutual agreement of the parties. Wray then appointed Brown-Forman, a Delaware corporation, to succeed UDV as its exclusive United States importer and distributor of Appleton Rum. The appointment was effective as of October 1.

During the period of October 1, 1994, through October, 2001, first Carriage, until 1997, and then UDV sold Appleton Rum to Walker. Brown-Forman, however, was not inclined to continue this practice beyond October, 2001. By letter dated September 4, 2001, Brown-Forman notified Walker that it intended "to consolidate the responsibility for [Wray] brands with [other] Brown-Forman brands in [Walker's] territory," and that come October 1, 2001, it would not makes sales of Appleton Rum to Walker.

3. *Prior proceedings.* Walker turned to the commission and argued that sales of Appleton Rum by Carriage and UDV to it should be attributed to Brown-Forman under c. 138, § 25E. It was undisputed before the commission that Brown-Forman did not itself make sales to Walker during the statutory six-month period. See *Charles E. Gilman & Sons, Inc.* v. *Alcoholic Bevs. Control Commn.*, 61 Mass. App. Ct. at 917-918 ("statutory limitation on wholesaler termination prescribed under § 25E attaches to a supplier upon the supplier's satisfaction of a condition: the sale of branded products to a wholesaler for a period of six months or more").

Relying on general principles of agency, the commission found that Wray's distributorship agreements provided Wray

that a "close degree of cooperation and concerted business planning and operation existed among Wray, [Rums], and [Carriage]." See generally *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 353 Mass. 614 (1968); *Westcott Constr. Corp.* v. *Cumberland Constr. Co.*, 3 Mass. App. Ct. 294 (1975); *Metivier* v. *McDonald's Corp.*, 16 Mass. App. Ct. 916 (1983).

[5]By an agreement dated January 6, 1997, Wray appointed Heublein, Inc. (Heublein), a Connecticut corporation, to serve as the exclusive importer and distributor of Appleton Rum in the United States. As a result of corporate mergers and reorganizations, the specifics of which are irrelevant to our decision, UDV succeeded to Heublein as the exclusive importer-distributor of Appleton Rum in the United States.

with sufficient control over the marketing and sale of Appleton Rum as to establish an agency relationship with its distributors. In the case of Carriage, the commission's finding of an agency relationship was based to some degree on Carriage's status as a wholly owned subsidiary of Wray. See note 4, *supra.* The commission ruled that the sales made by Carriage and UDV should be imputed to Wray under c. 138, § 25E, and that those statutory obligations also attached to its new agent, Brown-Forman.[6] On the basis of that ruling, the commission concluded that Brown-Forman's refusal to sell Appleton Rum to Walker violated § 25E and issued an order requiring Brown-Forman to make sales of Appleton Rum to Walker "in the regular course of business."[7]

Brown-Forman then took an appeal to the Superior Court pursuant to G. L. c. 30A, Walker intervened as a defendant, and they filed cross motions for judgment on the pleadings.[8] In ruling on the cross motions, the judge concluded that the commission's findings did not establish an agency relationship between Wray and UDV and that the absence of such a relationship severed an essential link in the commission's chain of attribution. The judge nullified the commission's basis for imputing to Brown-Forman any obligations to Walker under § 25E and ordered entry of judgment in favor of Brown-Forman.[9]

4. *Walker's argument.* Rather than argue in any meaningful manner whether or why the factors relied upon by the commission were competent or sufficient to show an agency relationship for purposes of imputing to Brown-Forman obligations to

---

[6]The commission made no finding, express or implied, that the movement of the Appleton brand from Carriage to UDV to Brown-Forman was undertaken for the purpose of evading the provisions of § 25E.

[7]In its decision, the commission noted that it construes the phrase "regular course" to obligate a supplier to sell up to 110 per cent per year of the highest annual sales, by product and size, sold to the wholesaler during the preceding four or five years. See *Somerset Importers, Ltd.* v. *Alcoholic Bevs. Control Commn.,* 28 Mass. App. Ct. 381, 387-388 (1990).

[8]The commission did not submit any pleadings in respect to the cross motions filed by Brown-Forman and Walker. See note 1, *supra.*

[9]In reaching her decision, the judge examined the terms of Wray's agreement with Brown-Forman and concluded that the commission was in error in finding that an agency relationship existed between them.

Walker under c. 138, § 25E, Walker contends that the judge failed to give proper deference to the commission's decision that a principal-agent relationship was created by the Wray-UDV distributorship agreement and makes what amounts to little more than a bare assertion that that relationship constituted a valid basis to impute obligations to Brown-Forman under § 25E.

5. *The applicable standard of review.* We review the commission's decision in accordance with the standards set out in G. L. c. 30A, § 14(7), and discussed in *Athol Daily News* v. *Board of Review of the Div. of Employment & Training*, 439 Mass. 171, 174 (2003). See *Buchanan* v. *Contributory Retirement Appeal Bd.*, 65 Mass. App. Ct. 244, 246 (2005), and cases therein cited. That is, we give due weight to the commission's experience, technical competence, specialized knowledge, and discretionary authority. "But this principle is one of deference, not abdication . . . ." *Leopoldstadt, Inc.* v. *Commissioner of the Div. of Health Care Fin. & Policy*, 436 Mass. 80, 91 (2002), quoting from *Protective Life Ins. Co.* v. *Sullivan*, 425 Mass. 615, 618 (1997). See *Arnone* v. *Commissioner of the Dept. of Social Servs.*, 43 Mass. App. Ct. 33, 34 (1997) ("[t]he approach is one of judicial deference and restraint, but not abdication").

If we determine that the commission's findings are supported by substantial evidence and that the proper legal standards were applied to those findings, we will uphold the commission's decision. *Athol Daily News* v. *Board of Review of the Div. of Employment & Training*, 439 Mass. at 174. When, however, pure questions of law are at issue, we exercise de novo review. *Buchanan* v. *Contributory Retirement Appeal Bd.*, 65 Mass. App. Ct. at 246. Although proof of an agency relationship is usually a question of fact, see *Pedersen* v. *Leahy*, 397 Mass. 689, 691 (1986); *Spencer* v. *Doyle*, 50 Mass. App. Ct. 6, 8 (2000), the question of agency becomes one of law in those instances where the relationship is found to exist on the basis of undisputed facts or unambiguous written documents. See *O'Brien* v. *Christensen*, 422 Mass. 281, 290 n.13 (1996). Compare *Morris* v. *Massachusetts Maritime Academy*, 409 Mass. 179, 191, 194 (1991) (even if facts undisputed, question of agency not solely question of law when conflicting inferences may lead to different but reasonable conclusions).

In the present instance, the commission drew no inferences from the unambiguous agreement other than its ultimate finding, which, no matter how couched, is in fact a conclusion of law that an agency relationship existed between Wray and UDV. Our review of the commission's decision is, therefore, de novo. See *Buchanan* v. *Contributory Retirement Appeal Bd.*, 65 Mass. App. Ct. at 246. See also *Raytheon Co.* v. *Director of the Div. of Employment Security*, 364 Mass. 593, 595 (1974); *Mackay* v. *Contributory Retirement Appeal Bd.*, 56 Mass. App. Ct. 924, 925 (2002).

6. *The Wray-UDV distributorship agreement and the commission's decision.* To put Walker's claims before us in perspective, we describe in some detail the terms of the Wray-UDV distributorship agreement and the basis of the commission's decision.[10]

a. *The agreement.* Pursuant to the terms of the agreement, UDV was appointed the sole and exclusive importer and distributor of Appleton Rum within the United States, while Wray continued to own the trademarks and goodwill associated with that brand. UDV was required to "maintain a properly trained sales force of adequate size"; "maintain inventories of the [product] to sufficiently service the requirements of the [market]"; "deliver the [product] to its customers . . . in accordance with good business practice and local custom"; and "use all reasonable efforts to distribute and sell the [product]." UDV had the right "to appoint such sub-distributors, brokers and agents . . . as it deem[ed] advisable in order to perform its . . . obligations under [the] Agreement."

The agreement specified annual sales objectives for UDV. Failure to meet the specified objectives for two consecutive contract years constituted grounds for either party to terminate the agreement. UDV was required to furnish Wray with monthly reports detailing sales and depletion rates by customers. While the agreement contemplated UDV's sale of competing products, Wray had the right to request that Appleton Rum and competing

---

[10]Because we have concluded that our review of the commission's decision is de novo, we need not discuss Walker's allegations of error concerning the judge's detailed and comprehensive memorandum of decision on Brown-Forman's appeal to the Superior Court pursuant to G. L. c. 30A.

products be handled by separate off-premises sales teams in UDV's largest markets where UDV maintained multiple sales forces.

Terms for Wray's sale of Appleton Rum to UDV were also set out in the agreement. Sale prices for the first contract year were set out in an exhibit attached to the agreement. Thereafter, and upon 180 days' prior notice to UDV, Wray had the right to raise its prices once a year in accordance with a formula set out in the agreement. Sales from Wray to UDV were F.O.B. Jamaica.

While UDV was granted an exclusive right to use the "Appleton" trademark in connection with the marketing and distribution of Appleton Rum within the United States, it was required to expend specified minimum amounts to advertise, market, and promote the sale of that product. All of UDV's marketing activities were to be conducted in accordance with a marketing plan developed by UDV and approved by Wray on a biannual basis.[11] The plan addressed such matters as the "intended personality and positioning of each [p]roduct," "pricing strategy," and the "projected allocation of the Mandatory AMP," defined in the agreement as the "amount of all returns, discounts and promotional credits accepted or furnished by [UDV] to its customers or consumers in connection with [Appleton Rum] in [a] Contract Year."

Wray could require UDV to discontinue any advertising, merchandising, or promotional activity that it deemed to be inconsistent with an approved plan or likely to damage its market reputation. The agreement also required Wray to contribute specified minimum amounts in support of UDV's marketing activities, and UDV to appoint one full-time marketing manager to work on Appleton Rum accounts. After notice and an opportunity to cure, either party could terminate their contractual relationship for the other's failure to "fulfill any material relationship, warranty or covenant." As a final matter,

---

[11]More specifically, at the inception of the agreement and every six months thereafter, UDV was required to meet with Wray to "discuss [its] plans for the advertising, marketing and promotion of [Appleton Rum]" during the following six-month period. Should the parties fail to agree on a plan or any aspect of it, the plan of the previous period was to be deemed "approved" by Wray.

the agreement provided that "no joint venture [is] created by this Agreement and that neither party can take any action that is legally binding on the other party without the prior consent of the party to be charged."

b. *The commission's decision.* In concluding that an agency relationship existed between UDV and Wray in UDV's "marketing and sale" of Appleton Rum, the commission pointed to the following rights retained by Wray under the agreement. Wray continued in its ownership of manufacturing rights in the rum as well as in its associated trademarks and goodwill, and it was continuously involved in producing and bottling the product. It also had control over UDV's national marketing activities, as manifested in its right to approve and demand conformity with a marketing plan, and it required UDV to expend specified minimum amounts to advertise, market, and promote the sale of Appleton Rum and to dedicate one marketing manager on a substantially full-time basis to the Appleton Rum accounts. Wray also had the right to require UDV to discontinue any advertising, merchandising, or promotional activity inconsistent with the approved plan or likely to damage its reputation. The commission also looked to the facts that Wray had the right to terminate the agreement should UDV fail to meet specified sales volumes and that the product was shipped by Wray F.O.B. Jamaica to UDV.

7. *Discussion.* "An agency relationship is created when there is mutual consent, express or implied, that the agent is to act on behalf and for the benefit of the principal, and subject to the principal's control." *Theos & Sons, Inc.* v. *Mack Trucks, Inc.*, 431 Mass. 736, 742 (2000). The commission's conclusion that an agency relationship existed between Wray and UDV rested on its relatively extensive findings concerning Wray's control of the marketing, advertising, and promotion of its products by UDV. However, for purposes of attribution to Brown-Forman under c. 138, § 25E, of the sales made to Walker by UDV, the relevant inquiry is whether UDV was acting as an agent for Wray for the discrete purpose of making regular sales of Appleton Rum to downstream customers. See *Pastene Wine & Spirits Co.* v. *Alcoholic Bevs. Control Commn.*, 401 Mass. at 619 (purpose of § 25E is to regulate relationships between wholesal-

ers and their suppliers); *Heineken U.S.A., Inc.* v. *Alcoholic Bevs. Control Commn.*, 62 Mass. App. Ct. at 572 (same). Cf. Restatement (Second) of Agency § 13 comment c, and § 14 comment a (1958). Under § 13, comment c, of the Restatement (Second) of Agency, the fact that one party has subsidiary duties to act for the interests of another, as where a purchaser of goods from a manufacturer agrees that he will advance the interests of the manufacturer in certain respects, does not create an agency relationship with respect to the sale. In addition, § 14, comment a, of the Restatement (Second) of Agency provides that an essential characteristic of an agency relationship is the right of a principal to control "what the agent shall or shall not do before the agent acts, or at the time when he acts, or at both times." See *Spencer* v. *Doyle*, 50 Mass. App. Ct. at 10. The commission made no findings of fact concerning Wray's right of control with respect to UDV's distribution and sale of Appleton Rum.

Our review of the administrative record concerning this central issue, the nature of the relationship created by the Wray/ UDV agreement, reflects the following undisputed facts. UDV had a broad right to appoint sub-distributors, that is, agents "as it deemed advisable" in order to perform its obligations under the agreement. On the other hand, there is nothing in the agreement that gave Wray the power to approve or veto UDV's appointment of downstream sellers nor to have any input into UDV's selection of those sellers. Compare *Spencer* v. *Doyle*, 50 Mass. App. Ct. at 9, 10 (company that bought accounts receivable at a discount did not act as agent for investors in retaining auditor, where investors had no right to control company's conduct with respect to its potential relationship with an auditor). In respect to sales, all that was shown was that UDV purchased Appleton Rum from Wray, assumed the risk of loss, and, thereafter, sold Appleton Rum for its own account.[12]

The evidence most directly related to the question of Wray's control over UDV's sales relationships concerns Wray's right to

---

[12]Restatement (Second) of Agency § 14J (1958) provides that these factors are probative on the issue whether "[o]ne who receives goods from another for resale to a third person," that is, a distributor or dealer, is the other's agent in the subsequent sale of the goods.

approve UDV's "pricing strategy" in connection with the marketing plan. Although a manufacturer's right to fix a price can be a factor indicative of a distributor's status as an agent under general agency principles, see *Staco Energy Prods. Co.* v. *Driver-Harris Co.*, 578 F. Supp. 700, 702 (S.D. Ohio 1983); Seavey, Agency § 11E (1964), here the evidence on this one factor consists of a solitary reference in the agreement made for the sole purpose of enumerating issues to be addressed in UDV's biannual marketing plan.

Absent some further explanation or finding by the commission indicating the actual extent to which Wray's right to approve UDV's "pricing strategy" affected UDV's ability to set prices, and in light of all other indications in the evidence to the contrary, including the fact that the parties' agreement provided that "no joint venture [is] created by this Agreement and that neither party can take any action that is legally binding on the other party without the prior consent of the party to be charged," see part 6(a), *supra*, we conclude that the evidence of Wray's right to approve UDV's "pricing strategy" is an insufficient basis upon which to sustain a finding of an agency relationship. See *Theos & Sons, Inc.* v. *Mack Trucks, Inc.*, 431 Mass. at 744 (while not dispositive on issue of agency, express disclaimer of agency relationship in parties' contract provided evidence of nonexistence of principal-agent relationship).[13]

As a final observation, we see nothing in *DeCantis* v. *Mid-*

---

[13] We note that a finding of agency in the circumstances before us would be at odds with a general principle recognized in some jurisdictions, i.e., that an independent distributor that purchases the goods of a manufacturer, bears the risk of loss, and sells for its own account is not a manufacturer's agent in the sale of the goods to its downstream customers. See, e.g., *Oberlin* v. *Marlin Am. Corp.*, 596 F.2d 1322, 1326-1327, 1335-1336 (7th Cir. 1979); *Leon* v. *Caterpillar Industrial, Inc.*, 69 F.3d 1326, 1335-1336 (7th Cir. 1995); *Burkhalter* v. *Ford Motor Co.*, 29 Ga. App. 592, 593-602 (1923); *State ex rel. Domino's Pizza, Inc.* v. *Dowd*, 941 S.W.2d 663 (Mo. Ct. App. 1997); *Pioneer Animal Clinic* v. *Garry*, 231 Neb. 349, 352-353 (1989); *Hunter Mining Labs., Inc.* v. *Management Assistance, Inc.*, 104 Nev. 568 (1988). Although distributors necessarily stand as an intermediary in the transfer of goods between two parties, see *General Motors Corp.* v. *Blackburn*, 403 Mass. 320, 323-324 (1988), whether they do so as agents or buyers acting in their own capacities turns mainly on whether the manufacturer and distributor contemplated that the distributor would act primarily for the benefit of the manufacturer or itself. See *Bushendorf* v. *Freightliner Corp.*, 13 F.3d 1024, 1026 (7th Cir. 1993); *Leon* v. *Caterpillar Industrial, Inc.*, *supra*; *Asante Technologies, Inc.* v. *PMC-*

*Atlantic Toyota Distribs., Inc.,* 371 F. Supp. 1238 (E.D. Va. 1974) (*DeCantis*), that supports Walker's contention that Wray exercised sufficient control over UDV to establish the existence of an agency relationship for purposes of imputing c. 138, § 25E, obligations to Brown-Forman. There the court considered whether an automobile distributor was "under the control" of the manufacturer as that term is used in 15 U.S.C. §§ 1221 et seq., the so-called Federal Automobile Dealers Day in Court Act. *DeCantis, supra* at 1244. In so doing, the court explicitly ruled that the test of "control" under 15 U.S.C. § 1221(a) was not necessarily the equivalent of a test applied consistent with general principles of agency. *DeCantis, supra.*[14]

Moreover, our reading of *DeCantis* leads us to conclude that its test for "control" cuts against rather than helps Walker. *De-Cantis* holds that a distributor is "under the control" of the manufacturer if "the manufacturer has the power, by contract or otherwise, *to direct the course of dealings between the wholesale distributor and its retail dealers*" (emphasis supplied). *Ibid.* See *Grappone, Inc.* v. *Subaru of America, Inc.,* 403 F. Supp. 123, 135-136 (D.N.H. 1975) ("fact that [the m]anufacturer exerts control over a portion of [the i]mporter's business is not dispositive of the issue [of control for purpose of § 1221(a)]; the control must be over [the i]mporter's relationship *vis-a-vis the retail dealers*" [emphasis original]). To the extent the factors relevant to the question of control under the Federal statute might independently support a finding of agency for purposes of c. 138, § 25E, evidence of those factors is absent in the present case. Contrast *DeCantis, supra* at 1239-1240, 1244-1245.

---

*Sierra, Inc.,* 164 F. Supp. 2d 1142, 1148 (N.D. Cal. 2001). See also Restatement (Second) of Agency § 14J (1958); 2 Corbin, Contracts § 6.4, at 232 (1995).

[14]Federal jurisdictions appear to be divided on the question "whether a finding of 'control' under the Act must be premised on agency principles." *Grappone, Inc.* v. *Subaru of America, Inc.,* 403 F. Supp. 123, 136 (D.N.H. 1975). See *Stansifer* v. *Chrysler Motors Corp.,* 487 F.2d 59, 64-66 (9th Cir. 1973), where the automobile dealer's franchise agreement was with a wholesale distributor rather than the manufacturer. See generally Who Is "Automobile Manufacturer" for Purposes of the Automobile Dealers Day in Court Act (15 USCS §§ 1221 et seq.), 51 A.L.R. Fed. 812 (1981 & Supp. 2005).

It follows from what we have said that the judgment is affirmed.

*So ordered.*