NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

18-P-1258                                        Appeals Court

MARTIGNETTI GROCERY CO., INC.[1]  vs.  ALCOHOLIC BEVERAGES CONTROL
                 COMMISSION & others.[2]


                      No. 18-P-1258.

   Suffolk.      September 5, 2019. - December 17, 2019.

          Present:  Rubin, Massing, & Englander, JJ.


Alcoholic Liquors, Alcoholic Beverages Control Commission,
     Supplier, Wholesaler.  Corporation, Sale of
     assets.  Administrative Law, Agency's interpretation of
     statute.  Words, "Continuing affiliation."




     Civil action commenced in the Superior Court Department on
August 24, 2017.

     The case was heard by Rosemary Connolly, J., on motions for
judgment on the pleadings.


     J. Mark Dickison for the plaintiff.
     Mary E. O'Neal for Constellation Brands, Inc., & another.
     Julie E. Green, Assistant Attorney General, for Alcoholic
Beverages Control Commission.
     William F. Coyne, Jr., for M.S. Walker, Inc., & another,
amici curiae, was present but did not argue.

---

     [1] Doing business as Carolina Wine Company.

     [2] Constellation Brands, Inc.; and Constellation Brands U.S.
Operations, Inc.

MASSING, J.  By statute, when a licensed Massachusetts wholesaler of alcoholic beverages has been distributing a particular brand name item for more than six months, the supplier cannot discontinue sales of the brand to the wholesaler without good cause.  See G. L. c. 138, § 25E (§ 25E).  When the supplier sells the brand to a new owner in an arm's-length transaction, however, the new owner is generally not required to assume the prior supplier's obligations to its Massachusetts wholesaler.  In this case, the producer and supplier of a popular brand of California wine sold the brand to a new owner through an asset purchase agreement.  At issue is whether this transaction, which did not produce an immediate, clean break between the operations of the prior supplier and the new owner, created a continuing affiliation such that the prior supplier's § 25E obligations must be imputed to the new owner.  The Alcoholic Beverages Control Commission (commission) determined that it did not, and a judge of the Superior Court agreed.  We affirm.[3]

Background.  The plaintiff, Martignetti Grocery Co., Inc., doing business as Carolina Wine Company (Carolina), is a Massachusetts wholesaler of alcoholic beverages licensed under

---

[3] We gratefully acknowledge the amicus curiae brief filed by M.S. Walker, Inc., and Ruby Wines, Inc.

G. L. c. 138, § 18.  Carolina had been the Massachusetts distributor of Meiomi wines, a brand produced and sold by Copper Cane, LLC (Copper Cane), until Copper Cane sold the brand to defendant Constellation Brands U.S. Operations, Inc., a wholly owned subsidiary of defendant Constellation Brands, Inc. (collectively, Constellation).  Shortly after the asset purchase agreement between Constellation and Copper Cane was completed, Constellation notified Carolina, as required under § 25E, that Constellation intended to discontinue sales of Meiomi wines to Carolina.  Carolina promptly appealed Constellation's notice of discontinuance to the commission.  See § 25E ("Either party may appeal to the commission for a hearing on the notice of discontinuance and the commission shall make a determination after hearing on the issue of good cause for discontinuance").  As the commission decided the appeal on cross motions for summary decision, we summarize the facts in the light most favorable to Carolina.[4]

Joseph Wagner, a fifth-generation Napa Valley, California, winemaker, began selling the Meiomi brand in 2007.  The brand,

---

[4] Because a motion for summary decision is "the administrative equivalent of a motion for summary judgment," Zoning Bd. of Appeals of Amesbury v. Housing Appeals Comm., 457 Mass. 748, 763 (2010), principles applicable to summary judgment decisions inform our review.  See, e.g., Casseus v. Eastern Bus Co., 478 Mass. 786, 792 (2018) (in reviewing decision on cross motions for summary judgment, evidence viewed in light most favorable to losing party).

and particularly its Pinot Noir, a variety that was experiencing a dramatic rise in popularity, was very successful. Carolina began distributing Meiomi wines in Massachusetts in 2012 and continued doing so in 2014 after Wagner formed Copper Cane to produce and sell the brand.

In August 2015 Constellation and Copper Cane entered into an asset purchase agreement, whereby Constellation purchased all of Copper Cane's assets and inventory associated with the Meiomi brand, including trade secrets, brand names, designs, procedures, good will, and its existing stock of wine in all states of production. Constellation also assumed certain contracts Copper Cane had with grape growers. At the same time, the parties entered into a number of transitional agreements to ensure the uninterrupted production and consistent quality of the brand through the transition in ownership. Because the production and bottling of the 2014 vintages were ongoing at the time of the acquisition, Copper Cane and Wagner agreed to continue the work necessary to complete bringing those wines to market for Constellation, which took until May 2016. This work required Copper Cane to maintain its Federal basic permit[5] as well as its California winemaker's license. Constellation also

---

[5] A Federal basic permit is required to import, produce, bottle, sell, purchase for resale, or distribute wine in the United States. See 27 U.S.C. § 203 (2012).

assumed Copper Cane's agreements with a winery and a bottling company that were integral in the production, storage, and bottling of the 2014 vintages. In addition, Copper Cane and Wagner, as an independent contractor, entered into a two-year consulting agreement with Constellation, in which they agreed to provide advice with respect to production and marketing of the brand.[6] Wagner, in his personal capacity, also agreed to allow Constellation to use his name and likeness in marketing and advertising the 2014, 2015, and 2016 vintages.

The parent company of Constellation, which possessed a certificate of compliance issued under G. L. c. 138, § 18B, allowing it to distribute alcoholic beverages in Massachusetts, assumed responsibility for sales of the brand. Intending to engage Horizon Beverage Company, with which it had a pre-existing distribution agreement, as its Massachusetts wholesaler, Constellation gave notice to Carolina that it would be discontinuing sales of the Meiomi brand to Carolina.[7]

---

[6] The consulting agreement anticipated that Copper Cane and Wagner would devote no more than twenty hours per month during the harvest and no more than ten hours in other months during the first year, then ten and five hours per month in those periods of the second year.

[7] The asset purchase agreement also included a provision requiring Copper Cane, upon the public announcement of the sale of the brand, to give notice of termination to each of its distributors.

Carolina appealed the notice of discontinuance to the commission, arguing that Copper Cane's and Wagner's continued involvement with the brand amounted to a continuing affiliation with Constellation, such that Copper Cane's obligations to Carolina under § 25E should be imputed to Constellation. On the parties' cross motions for summary decision, the commission determined that Constellation's asset purchase agreement with Copper Cane was a bona fide, arm's-length transaction, and that the transitional agreements among Constellation, Copper Cane, and Wagner were not intended to evade § 25E and did not amount to a continuing affiliation. Accordingly, the commission denied Carolina's appeal and allowed Constellation to discontinue sales of Meiomi brand wines to Carolina. A Superior Court judge affirmed the commission's decision.

Discussion. 1. The "continuing affiliation" doctrine of § 25E. Section 25E "makes it an unfair trade practice for a manufacturer (or other supplier), absent good cause, to refuse to sell a brand of alcohol to a wholesaler if the manufacturer has made regular sales of such brand to the wholesaler during the preceding six-month period." Heublein, Inc. v. Capital Distrib. Co., 434 Mass. 698, 699-700 (2001).[8] The purpose of

_____

[8] For the purposes of this appeal, the relevant provisions of § 25E are as follows:

§ 25E is to strike a balance between the competing interests of suppliers, who generally enjoy superior bargaining power, and wholesalers. See <u>Seagram Distillers Co</u>. v. <u>Alcoholic Beverages Control Comm'n</u>, 401 Mass. 713, 716-717 (1988). However, while § 25E serves "to counteract a tendency toward vertical integration in the liquor distribution industry . . . and to redress economic imbalances in the relationship of wholesalers and their suppliers," it is not "intended to 'generate inequities against suppliers.'" <u>Pastene Wine & Spirits Co</u>.

---

"It shall be an unfair trade practice and therefor unlawful for any manufacturer, winegrower, farmer-brewer, importer or wholesaler of any alcoholic beverages, to refuse to sell, except for good cause shown, any item having a brand name to any licensed wholesaler to whom such manufacturer, winegrower, farmer-brewer, importer or wholesaler has made regular sales of such brand item during a period of six months preceding any refusal to sell.

". . .

"Good cause as used herein shall be limited to the following conduct:

"(<u>a</u>) disparagement of the product so as to impair the reputation of the brand owner or the brand name of any product,

"(<u>b</u>) unfair preferment in sales effort for brand items of a competitor,

"(<u>c</u>) failure to exercise best efforts in promoting the sale of any brand item,

"(<u>d</u>) engaging in improper or proscribed trade practices, or

"(<u>e</u>) failure to comply with the terms of sale agreed upon between supplier and wholesaler."

v. Alcoholic Beverages Control Comm'n, 401 Mass. 612, 618-619 (1988), quoting Amoco Oil Co. v. Dickson, 378 Mass. 44, 49-50 (1979).

"Generally speaking, a supplier is not obligated under § 25E to continue to make sales to those wholesalers with whom an unaffiliated predecessor did business." Brown-Forman Corp. v. Alcoholic Beverages Control Comm'n, 65 Mass. App. Ct. 498, 499 (2006). Section 25E obligations attach to the supplier rather than to the brand. See Heublein, Inc., 434 Mass. at 706; Brown-Forman Corp., supra. Because Constellation did not "ma[k]e regular sales of such brand item [to Carolina] during a period of six months preceding any refusal to sell," § 25E, the "literal wording of the statute" does not prohibit Constellation from refusing to sell the brand to Carolina. Heublein, Inc., supra at 708.

Carolina nonetheless asserts that Copper Cane's § 25E obligations to it must be imputed to Constellation because Copper Cane is not an unaffiliated predecessor. Carolina contends that the transitional agreements in which Copper Cane and Wagner agreed to complete the production of the 2014 vintages for Constellation, to consult for a two-year period in the production and marketing of the brand, and for Wagner to allow use of his name and likeness, amount to a "continuing

affiliation" that operates under § 25E to prevent Constellation for discontinuing sales of the Meiomi brand to Carolina.

The § 25E obligations that a brand's supplier owes to its wholesalers are not imputed to the purchaser of the brand "where the acquisition of the product assets and their distribution rights were made at arm's length," unless there is evidence of an "agency relationship or continuing affiliation between [the prior supplier] and [the new owner] following the completion of the sale" (emphasis added).  Heublein, Inc., 434 Mass. at 708. See Gilman & Sons, Inc. v. Alcoholic Beverages Control Comm'n, 61 Mass. App. Ct. 916, 918 (2004) ("buyer's general contractual assumption of the seller's liabilities under an arm's-length asset purchase agreement" did not impute seller's § 25E obligations to the buyer).  Section 25E obligations may be imputed not only in in the case of a continuing affiliation or an agency relationship between the prior supplier and the new owner, but also in the case of "an assignment of distribution rights," Heublein, Inc. v. Alcoholic Beverages Control Comm'n, 30 Mass. App. Ct. 611, 614 (1991), "where the commission finds that a transfer of distribution rights was undertaken primarily for the purpose of evading those obligations imposed by the statute," Brown-Forman Corp., 65 Mass. App. Ct. at 500,[9] or where

---

[9] Structuring an arm's-length acquisition so as not to assume the seller's distributor or wholesaler agreements serves

"some other principle of law" so requires, Heublein, Inc., 434
Mass. at 708.

Our decisions offer little guidance concerning the nature
of the relationship between a former supplier and a purchaser of
a brand that would amount to a continuing affiliation under
§ 25E.  Our review of numerous decisions of the commission and
of cases dealing with relevant principles of corporate and
agency law suggest some broad guideposts.  At one extreme, a de
facto merger between the original supplier and its successor, in
which the successor business is in essence a continuation of the
predecessor's operations, would require assumption of the
original supplier's § 25E obligations.  See Cargill, Inc.
v. Beaver Coal & Oil Co., 424 Mass. 356, 359 (1997) ("the
liabilities of a selling predecessor corporation are not imposed
on the successor corporation which purchases its assets unless
[1] the successor expressly or impliedly assumes the liability
of the predecessor, [2] the transaction is a de facto merger or
consolidation, [3] the successor is a mere continuation of the
predecessor, or [4] the transaction is a fraudulent effort to
avoid liabilities of the predecessor").  On the other hand,
there is no continuing affiliation after an arm's-length

---

a legitimate business purpose and does not by itself equate with
an intent to circumvent § 25E.  See Heublein, Inc., 434 Mass. at
704 & nn.11-12.

transaction where "[c]ertain transitional agreements between
[the buyer] and the seller obligated the seller to assist [the
buyer] in producing the brands of gin and scotch in question
during an interim period" (emphasis added).  Gilman & Sons,
Inc., 61 Mass. App. Ct. at 918.[10]

Decided in the context of the doctrine of agency, our
decision in Brown-Forman Corp., 65 Mass. App. Ct. at 498, is
instructive with respect to the issue of continuing affiliation.
The question in Brown-Forman Corp. was whether J. Wray & Nephew
Limited (Wray), the producer and seller of Appleton Rum, had a

---

[10] The commission's recent decisions concerning whether
transitional agreements form the basis for a continuing
affiliation follow a Superior Court decision, Beam Spirits &
Wine, LLC vs. Alcoholic Beverages Control Comm'n, Mass. Super.
Ct., No. SUCV201302229C (Suffolk County Aug. 18, 2014), in which
a Superior Court judge reversed a commission decision.  In that
case, Beam Spirits & Wine, LLC (Beam) purchased the right to
produce, market, promote, distribute, and sell the "Skinnygirl
Margarita" brand from Skinny Girl Cocktails, LLC (Skinny Girl).
Prior to the sale, Palm Bay International (Palm Bay), through a
distributor agreement with Skinny Girl, sold the brand to a
Massachusetts wholesaler, United Liquors, LLC.  The commission
found a continuing affiliation among Beam, Palm Bay, and Skinny
Girl because two of Palm Bay's principals were ancillary
signatories to the asset purchase agreement between Beam and
Skinny Girl, and because the brand's celebrity founder and
coowner retained control of the product recipe for a substantial
period of time after the sale.  The founder also agreed to
provide services to help Beam advertise and market the brand and
develop new products.  The Superior Court judge reversed the
commission's decision, concluding that Palm Bay and its
principals had no affiliation with Beam and that the founder's
postacquisition services on Beam's behalf, which were limited to
production and marketing, provided no basis to impute Palm Bay's
§ 25E obligations to Beam.

principal-agent relationship with its distributor, United Distillers and Vintners (UDV), such that when Wray chose Brown-Forman Corporation as a successor to UDV, Brown-Forman was required to assume UDV's § 25E obligations to its Massachusetts wholesaler. Id. at 500-502. Although Wray controlled the marketing, advertising, and promotion of the product, UDV purchased the product from Wray, appointed wholesalers without Wray's input or approval, and sold the product for "its own account," assuming the risk of loss. Id. at 506-507. Stating that "the relevant inquiry is whether UDV was acting as an agent for Wray for the discrete purpose of making regular sales of Appleton Rum to downstream customers," id. at 506, we held that UDV was not acting as Wray's agent for this purpose, id. at 508. Accordingly, when Wray terminated its distributor arrangement with UDV and contracted with a new distributor unaffiliated with UDV, Brown-Forman Corporation, the new distributor was not bound to continue sales of Appleton Rum to the Massachusetts wholesaler previously engaged by UDV.

2. Review of the commission's decision. In the present case, the commission determined that the transitional agreements between Constellation, Copper Cane, and Wagner did not support a finding of continuing affiliation.[11] Like the Superior Court, we

___

[11] The commission further found that no agency relationship existed between Constellation and Copper Cane, that Copper Cane

review the commission's decision under G. L. c. 30A, § 14, to determine whether the decision is warranted by the summary decision record and not based on any error of law. See Heublein, Inc., 434 Mass. at 704-705; Heineken U.S.A., Inc. v. Alcoholic Beverages Control Comm'n, 62 Mass. App. Ct. 567, 571-572 (2004).

The commission began its analysis of the continuing affiliation question by noting that the transitional agreements "were temporary and limited in scope."  Citing Brown-Forman Corp., 65 Mass. App. Ct. at 507, and a Superior Court decision, see note 10, supra, the commission concluded that "it is not evidence of a continuing affiliation between the former supplier company and new supplier company where the brand's creator, individually on his/her own, continues to assist with the marketing of the brand."  The commission noted that the transitional agreements did not "allow Copper Cane to provide input or control in the selection of distributors or downstream customers," and that Copper Cane retained no "rights or obligations regarding the sales, distribution, or wholesaler

---

did not assign its distribution rights to Constellation, and that the transaction was made at arm's length and was not structured to evade § 25E.  Carolina does not challenge any of these findings.  See Pastene Wine & Spirits Co., 401 Mass. at 616 (commission's factual finding that acquisition is not intended to circumvent § 25E will be upheld if based on substantial evidence).

network" of the brand.  The commission also observed that Constellation did not assume or make use of Copper Cane's certificate of compliance to sell wine in Massachusetts.[12]

The commission's decision is sound as a matter of law and supported by substantial evidence.  The asset purchase agreement was an arm's-length transaction; Copper Cane and Wagner did not retain any ownership or profit-sharing interest in the brand. Constellation did not need to assume Copper Cane's licenses to distribute the brand in Massachusetts, as Constellation possessed its own G. L. c. 138, § 18B, certificate of compliance.  The transitional agreements did not leave Copper Cane, which had sold the brand to Carolina for more than six months, in the position of controlling Constellation's sales of

---

[12] The commission, distinguishing one of its prior decisions, Martignetti Grocery Co. vs. Pine Ridge Winery, LLC, ABCC decision No. 25E-1285 (Nov. 20, 2013) (Pine Ridge), also observed that Constellation did not hire any of Copper Cane's employees in permanent, significant management roles.  In Pine Ridge, the commission found a continuing affiliation based in part on the fact that the terms of the asset purchase agreement required the purchaser of a family-owned wine label to offer employment to fifty-five of the prior owner's employees, including the two family members who acted as the chief executive officer and the head winemaker, stating, "It is axiomatic that without a winemaker, there is no wine; without any wine, there can be no wine business."  The commission's emphasis in Pine Ridge on the new owner's retention of managers from the prior owner involved in the production process, absent any factors that would impose the prior owner's liabilities on it successor, was misplaced.  See Brown-Forman Corp., 65 Mass. App. Ct. at 506.  The commission had no need to distinguish this aspect of its prior decision.

the brand to downstream customers.  Although Copper Cane and Wagner continued to be involved in winemaking, bottling, and advertising, such activities are not indicative of the type of continuing affiliation that would require Constellation to assume the Copper Cane's § 25E obligations to its Massachusetts wholesalers.[13]

<u>Judgment affirmed</u>.

---

[13] Carolina also contends that the commission erred by not viewing the facts in the light most favorable to it in the summary decision.  Specifically, Carolina argues that for Constellation to complete production of the 2014 vintages, it had to rely on Copper Cane's Federal basic permit and its California winemaking permit.  We discern no error.  This evidence is neither disputed nor material.  While Copper Cane's permits may have been necessary to complete the production of the 2014 vintages, they were not necessary for Constellation to distribute the wine, which is the relevant concern.