Hand, J.
Defendant-appellants Thomas R. Gutzler (“Gutzler”) and John Gutzler are trustees of the Gutzler Property Trust (the ‘Trust”). At all relevant times, the Trust has owned properties at 294 and 294R Commercial Street, Provincetown (respectively, “294” and “294R”) (collectively, “complex”). Plaintiff-appellee LFS Group, Inc. (“LFS”) is a property-management company owned by Laurie Ferrari-Sacco (“Ferrari-Sacco”). LFS managed the complex for the Trust. Gutzler, who has lived in Florida for the past 20 years, was the Trust’s de facto liaison with LFS during the parties’ professional relationship. There is no evidence that the parties ever entered into any written contract for property-management services; the terms of the parties’ relationship were defined by their course of dealing over a period of years.
The complex included a commercial space as well as one residential apartment at 294 and two at 294R. The complex’s commercial tenant paid rent on an annual basis. During the parties’ working relationship, LFS’ responsibilities for the complex included collecting rents and paying bills. The Trust afforded Ferrari-Sacco broad discretion in financial matters concerning the complex. As the Trust conceded in its brief, “Ferrari had total control over the bank account: she received the monthly statements; she deposited rent checks; and she wrote all the bills. A decision as to which bills were to be paid, and in what order, was made solely by Ferrari.” LFS was also responsible for overseeing the maintenance at the complex. LFS managed the work, using its own crews of painters and handymen, and invoicing the Trust for the work done. There is no evidence that, at any time during the parties’ relationship, *84 the Trust provided any specific or detailed instruction about how LFS or LFS’ workers were to perform their jobs, or that the Trust ever instructed LFS that the Trust wanted to have particular input on who did the hands-on portions of any work LFS supervised at the complex. In short, on the record before us, it is clear that Gutzler discussed with LFS the general budget and scope of any planned maintenance on an annual basis, and the need for unanticipated work as LFS became aware of those needs, but that the Trust otherwise left the conduct of maintenance and repair work to the complex entirely up to LFS.
Ferrari-Sacco met personally with Gutzler at least once a year to establish an annual budget for the complex. Other than those face-to-face meetings, Ferrari-Sacco and Gutzler communicated by telephone and e-mail oh an as-needed basis. In January, 2006, at their annual meeting, Ferrari-Sacco and Gutzler established a working budget for that year, including anticipated maintenance and repair costs for the complex. Gutzler told Ferrari-Sacco that he wanted to be notified if expenses were to exceed $1,000.00.[5]
In October, 2006, one of the residential tenants at 294R, Angel Colozzo (“Colozzo”), was evicted from his apartment (“Colozzo unit”). Following Colozzo’s departure, Ferrari-Sacco conducted a walk-through of the apartment and learned that the tenant had left the unit “trashed” and a “mess.” On the recommendation of the sheriff involved in Colozzo’s eviction, Ferrari-Sacco took photographs of the apartment as Colozzo had left it. When informed of the Colozzo unit’s condition, Gutzler told Ferrari-Sacco “to get the place cleaned up” and prepared for rental. Ferrari-Sacco and Gutzler discussed the likely cost of the renovations. There was no discussion between the parties about obtaining bids for the renovation of the Colozzo unit, and LFS had its own employees perform the necessary work. The project ultimately cost more than $6,000.00. By January, 2007, Gutzler had seen and approved the renovation of the Colozzo unit. When the Colozzo unit was next rented, LFS successfully demanded a higher monthly rent for the apartment than it had been able to obtain before the unit was repaired.
In the late spring of 2007, after LFS’ successful renovation of the Colozzo unit, two additional residential tenants vacated apartments in the complex. In May, 2007, *85 James Bonnie (“Bonnie”) was evicted from the bottom apartment in 294R (“Bonnie unit”), leaving it in “pretty horrendous” condition. The vacated Bonnie unit had a “smell,” the walls were in “really poor condition,” certain of the cabinets in the apartment were “falling apart,” and the apartment contained discarded hypodermic needles. Gutzler’s testimony was that Ferrari-Sacco described the Bonnie unit as a “mess,” language very similar, if not identical, to the words she had used in describing the Colozzo unit before LFS renovated it. As in the case of the Colozzo unit, the sheriff advised Ferrari-Sacco to take photographs to document the poor condition of the vacated unit, and she did so. Informed that the apartment needed work before being rented again, Gutzler told Ferrari-Sacco to “get the place cleaned up for rental.” Given her discussions with Gutzler about the work needed to restore the Colozzo unit to a rentable condition, and the similar conditions of the two units after the evictions of their respective tenants, Ferrari-Sacco believed that Gutzler was well aware that the cost of the work on the Bonnie unit would exceed $1,000.00 and did not take further steps to notify the Trust of that fact.
Shortly thereafter, in June, 2007, tenant Julie Brown (“Brown”) moved out of the apartment in 294 (“Brown unit”). While Brown’s unit was not left in the chaotic state in which Ferrari-Sacco had found the vacated Colozzo and Bonnie units, Ferrari-Sacco’s view was that Brown’s apartment was not in a rentable condition. Ferrari-Sacco noted the empty apartment to be “old and deteriorated” with the trim “black with chipped paint.” Gutzler told Ferrari-Sacco to “clean the place tip and get it ready for rent.” As in the case of the Bonnie unit, Ferrari-Sacco believed that Gutzler was aware that the cost of the work to the Brown unit would exceed $1,000.00. LFS did not explicitly advise the Trust of the estimated costs of repair.
There is no evidence in the record that the parties discussed the renovation of either the Bonnie or Brown units in any greater detail. After speaking with Gutzler, Ferrari-Sacco understood that she was to restore both the Bonnie and the Brown units to a rentable condition, comparable to that of the repaired and updated Colozzo unit. As noted, LFS employees had done the repair and renovation work on the Colozzo unit; LFS also performed the work on the Bonnie and Brown units. There was no evidence at trial that Gutzler, or the Trust, ever expressed a desire to obtain bids for the necessary work on the Bonnie or the Brown unit. When the Bonnie unit was rented again, it was rented for more than Bonnie had paid.[6] LFS charged the Trust $4,660.00 for the work to the Bonnie unit and $5,406.74 for its work on the Brown unit. Additionally, LFS billed the Trust for $1,175.72, plus finance charges, for hardware supplies charged at Lands End Marine Supply, Inc. Contending, primarily, that LFS had been required to obtain the Trust’s approval for expenses over $1,000.00 in connection with LFS’ work on the complex, but did not do so in connection with the work on the Bonnie and Brown units, and secondarily, that LFS had engaged in improper self-dealing in failing to put the contested work out for bid, the Trust declined to pay LFS’ *86 invoices for the work. The Trust also refused to settle the account with the hardware supplier.
LFS sued the Trust on six theories: breach of contract; violation of the Consumer Protection Act, G.L.c. 93A, §11; fraud or misrepresentation; breach of the implied covenant of good faith and fair dealing; unjust enrichment, and quantum meruit. The Trust raised no counterclaims; at trial, the Trust’s defenses included LFS’ alleged breaches of implied covenants of good faith and fair dealing and of its duty of loyalty, as an agent, to the Trust, as principal. The trial judge found that LFS failed to prove its G.L.c. 93A claim and its claim for fraud and misrepresentation, and that no enforceable contract existed between the parties. The judge found in favor of LFS on its claim for unjust enrichment for a recovery in quantum meruit. The court found no agency relationship existed between the parties.
On this appeal, the Trust challenges the judge’s findings that no valid contract existed between the parties, that LFS was entitled to recovery in quantum meruit and was not barred from recovery by its own breaches of the implied covenant of good faith and fair dealing, and that no agency relationship existed between LFS and the Trust. On each of these questions, we affirm the trial court.
1. We first review the trial court’s findings concerning LFS’ breach of contract claim, and the Trust’s defenses related to that claim. Where, as here, the evidence of the existence of a valid contract is disputed, the contract’s existence is a question of fact. See, e.g., LeMaitre v. Massachusetts Turnpike Auth., 70 Mass. App. Ct. 634, 637-638 (2007), S.C., 452 Mass. 753 (2008), citing Jackson v. Action for Boston Community Dev., Inc., 403 Mass. 8, 9 (1988); Turner v. Community Homeowner’s Ass’n, Inc., 62 Mass. App. Ct. 319, 324-325 (2004), citing Goldstein v. Katz, 325 Mass. 428, 430 (1950), and Madden v. Estin, 28 Mass. App. Ct. 392, 395 (1990). The trial court found that the parties never reached a meeting of the minds on at least one of the material terms of any claimed contract for renovation of the Bonnie and Brown units, namely, the significance of the $1,000.00 “expenditure threshold” Gutzler and Ferrari-Sacco agreed they discussed in 2006. The judge found that LFS understood that it was “to advise the Trust when the $1,000 threshold was reached,” while Gutzler understood that he would have “the right to approve, or not, any expenditure at that level.” Further complicating the question, the court found that the parties had not reached agreement even on the question of whether the $1,000.00 threshold applied only to single expenditures, to single projects, or, instead, to each $1,000.00 spent, determined cumulatively. The record supports these factual findings as well as the judge’s ruling that no valid contract existed between the parties for the work LFS performed on the Bonnie and Brown units. See, e.g., Situation Mgt. Sys., Inc. v. Malouf Inc., 430 Mass. 875, 878 (2000) (“It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract. ...”); Lucey v. Hero Int'l Corp., 361 Mass. 569, 574 (1972). The material terms must be sufficiently defined “so that the intentions of the parties may be discovered, the nature and extent of their obligations ascertained, and their rights determined.” Lucey, supra, quoting Cygan v. Megathlin, 326 Mass. 732, 733-734 (1951). ‘We do not set aside a judge’s findings of fact unless *87 they are ‘clearly erroneous.’” Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 509 (1997).[7]
2. The absence of any enforceable contract between the parties disposes of the Trust’s defense based on LFS’ purported breaches of the implied covenant of good faith and fair dealing, and provides the foundation for the court’s award to LFS in quantum meruit.
As to the first issue, the Trust raised LFS’ breach of the covenant of good faith and fair dealing as a defense to LFS’ contract claims. The demise of the contract claim spells the demise of the defense; in the absence of a valid contract claim, the defense is moot. Compare Mass. R. Civ. R, Rule 12 (defenses) with Mass. R. Civ. R, Rule 13 (counterclaims), and Reporter’s Notes to each rule. Second, where no valid contract existed between the parties for LFS’ work on the Bonnie and Brown units, the court was free to consider LFS’ claim for unjust enrichment damages on a theory of quantum meruit.[8] See Boswell v. Zephyr Lines, Inc., 414 Mass. 241, 250 (1993) (“Recovery in quantum meruit presupposes that no valid contract covers the subject matter of a dispute. Where such a contract exists, the law need not create a quantum meruit right to receive compensation for services rendered.”). In *88 the circumstances of this case, the court committed no error in determining that LFS’ work on the Bonnie and Brown units unjustly enriched the Trust. The evidence was clear that LFS made documented improvements to each unit and that, at least in the case of the Bonnie unit, LFS’ work increased the rental value of the unit. LFS also provided ample evidence of the time and labor it invested in the improvement, and of the course of dealing between the parties, to establish the reasonableness of LFS’ expectation that it would be paid for its work. See Salomon v. Terra, 394 Mass. 857, 859 (1985), citing U.S. Controls Corp. v. Windle, 509 F.2d 909, 912 (7th Cir. 1975). See also Community Bldrs., Inc. v. Indian Motocycle Assocs., Inc., 44 Mass. App. Ct. 537, 560 (1998) (whether given enrichment and detriment are “unjust” is factual determination, and “turns on the reasonable expectations of the parties”). There was no error in the court’s award of quasi-contractual damages.[9]
3. The Trust’s remaining argument, that LFS breached a fiduciary duty by engaging in self-dealing in the work on the Bonnie and Brown units, also fails based on the propriety of the trial court’s determination that LFS was an independent contractor for that work, and not the Trust’s employee or servant. Where the relationship between the parties is not established as a matter of law by undisput *89 ed facts or unambiguous written documents, the existence of an agency relationship is a question of fact. See, e.g., Cheek v. Econo-Car Rental Sys. of Boston, Inc., 393 Mass. 660, 662 (1985), citing Thomes v. Meyer Store Inc., 268 Mass. 587, 588 (1929); Brown-Forman Corp. v. Alcoholic Beverages Control Comm’n, 65 Mass. App. Ct. 498, 503 (2006); Anderson v. Osgood, 2 Mass. App. Ct. 800, 801 (1974), citing Stern v. Lieberman, 307 Mass. 77, 81 (1940). “An agency ‘results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control.’” Kirkpatrick v. Boston Mut. Life Ins. Co., 393 Mass. 640, 645 (1985), quoting RESTATEMENT (SECOND) OF AGENCY §1, at 7 (1958). The pivotal question in determining whether a party is an employee or, instead, an independent contractor, is whether the ostensible principal has the right to control the agent’s work. If the person doing the work is responsible only for the performance of what he agrees to do, and has a measure of discretion in the details of how the work is done, that individual is an independent contractor. The fact that the hiring party retains the right to inspect the work, or to insist that the work be completed, does not change the contractor’s independent status. An employee or agent, by contrast, is one who is “at every moment, with respect to every detail [of the work], ... bound to obedience and subject to direction and control, as distinguished from a right of inspection and insistence that the contract be performed.” McDermott’s Case, 283 Mass. 74, 76 (1933). See Kelley v. Rossi, 395 Mass. 659, 661 (1985) (characterizing right to control as “guiding principle” and holding summary judgment to be inappropriate where city’s right to direct and control doctor working in hospital emergency room was in dispute). This test for distinguishing employees from independent contractors is consistent with the terms of the RESTATEMENT (SECOND) OF AGENCY (1958), including the multi-factoral considerations set out there. Comment (e) to RESTATEMENT (SECOND) OF AGENCY §220(1), at 488 points out that an individual rendering service who retains control over the manner of performing that service is an independent contractor and not a servant. In determining whether one acting for another is a servant or an independent contractor, the following factors, among others, are considered:
(a) the extent of control which, by the agreement, the master may exercise over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation .; (d) the skill required in the particular occupation; (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (1) the length of time for which the person is employed; (g) the method of payment...; (h) whether or not the work is a part of the regular business of the employer; (i) whether or not the parties believe they are creating the relation of master and servant; and © whether the principal is or is not in business.
RESTATEMENT (SECOND) OF AGENCY §220(2), at 485-486.
Application of the Restatement factors to the facts of this case does not demand a different result than that reached by the trial judge. There is nothing in the record here that suggests that, with respect to the disputed work within the complex, *90 Gutzler ever sought to control how LFS did its work.[10] In fact, Gutzler’s testimony was that although Ferrari-Sacco told him that the Bonnie and Brown units needed work to restore them to a rentable condition, he never asked the condition of either unit before authorizing LFS to prepare them for rental. Consistent with the parties’ usual course of dealing, particularly although not exclusively in the wake of the Colozzo unit’s renovation,[11] Ferrari-Sacco understood Gutzler’s tasking LFS with “prepar[ing] [a unit in the complex] for rental” to be shorthand for the Trust giving her authority to determine what work was reasonably necessary to make the unit competitive in the rental market and to complete that work. The Trust delegated a generally defined project — preparing the complex for rental — to a property manager able to plan and implement the particular work needed to accomplish that goal.
Additionally, LFS is a property-management business distinct from any “business” that the Trust engages in as a landlord. Based on the evidence at trial, we can fairly infer that the complex represented only a fraction of the 400 or so units LFS managed at the time of trial, and that the Trust hired LFS precisely to eliminate the need for the Trust to provide the day-to-day care and management that the complex required. LFS had obvious experience and special skill in ensuring that rental operations, including, presumably, properties like the complex remained competitive in the rental market and that they remained occupied by paying tenants. Not only was there no evidence of an agreement between the parties that the Trust could direct LFS in the specifics of the cleaning and restoration work on the disputed units, but it also appears clear that Gutzler delegated each project to LFS to complete, subject to Gutzler’s later inspection. LFS provided its own labor and tools for the work that it did, and billed for the disputed renovations on a project-by-project basis.
Thus, LFS was an independent contractor, and not an employee, for the purposes of managing the complex. To the extent that the Trust’s defenses are premised on the existence of an agency relationship between the parties, they are unavailing.
Judgment affirmed.
So ordered.

 Ferrari-Sacco testified that, in 2006, Gutzler told her that “ [i]f there was any expense over a thousand [dollars] that he wanted to be notified.” Gutzler did not testify about the specifics of any instruction he gave to Ferrari-Sacco about a $1,000.00 benchmark for expenditures, but the Trust’s pretrial memorandum states: “Defendants claim that the plaintiff exceeded its agreement with the plaintiff that no expense in excess of $1,000 was to be incurred without defendants’ prior approval.” The judge found as a fact that in January, 2006, Gutzler told Ferrari-Sacco that “he wanted to be notified if the expenses were to exceed $1,000,” and that “if an expense were to exceed that figure, Ferrari-Sacco was to call him, before incurring the expenditure if possible.” This finding is not erroneous. See, e.g., Mass. R. Civ. R, Rule 52 (c); 31-35, LLC v. Zucco, 2008 Mass. App. Div. 14, 16 (appellate court reviews trial court’s factual findings for clear error, giving due regard to the trial judge’s ability to determine the weight and credibility of the evidence presented).

 The record is silent on the issue of whether the rent for the Brown unit changed after that unit was renovated.

 Findings are clearly erroneous when, “although there is evidence to support [them], the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.” Demoulas, supra at 509, quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). The judge, with a “firsthand view of the presentation of evidence, is in the best position to judge the weight and credibility of the evidence.” New England Canteen Serv., Inc. v. Ashley, 372 Mass. 671, 675 (1977), citing Oberg v. Burke, 345 Mass. 596, 598 (1963). While we agree with the trial court’s findings here, we note that our agreement is not determinative. “If the [trial] court’s account of the evidence is plausible in light of the record viewed in its entirety, the [appellate court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be clearly erroneous.” Gallagher v. Taylor, 26 Mass. App. Ct. 876, 881 (1989), quoting Anderson v. Bessemer, 470 U.S. 564, 573-574 (1985).

 LFS’ claims for recovery in quantum meruit were explicitly grounded on a theory of unjust enrichment. An unjust enrichment claim permits a plaintiff to seek recovery for the measurable benefit the plaintiff conferred on the defendant in reasonable expectation of being paid for it. See, e.g., Salamon v. Terra, 394 Mass. 857, 859 (1985); Wendt v. Barnum, 2007 Mass. App. Div. 93, 96, citing Home Carpet Cleaning Co. v. Baker, 1 Mass. App. Ct. 879, 880 (1974). To recover on this species of quasi-contractual claim, the plaintiff must show both that the benefit conferred unjustly enriched the defendant and that the resulting detriment to the plaintiff was also unjust. See Rosano-Davis, Inc. v. Sastre, 2004 Mass. App. Div. 55, 57, citing Salamon, supra at 859, and LaChance v. Rigoli, 325 Mass. 425, 427 (1950). Quantum meruit recovery is also available in other contexts, including where a plaintiff, acting in good faith, substantially performs on a valid contract. See, e.g., J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 796 (1986).

 The Trust’s appeal includes reference to the trial judge’s denial of the Trust’s motions in limine (1) to preclude LFS from introducing evidence of the condition of the Bonnie and Brown units at the time LFS undertook its work on those units, in light of the fact that the Trust did not see the condition of the units before work began, and (2) to introduce expert testimony on the fair value of the work necessary to prepare the units for rental. The trial court has broad discretion in ruling on evi-dentiary matters at trial. The Trust’s first argument fails to account for the fact that, at least with respect to the Bonnie unit, LFS took photographs of the apartments condition before undertaking any work. It also overlooks the lack of evidence suggesting that the Trust expressed any interest in LFS providing a detailed description of the units’ conditions, or in inspecting the units before LFS undertook repairs to each one. There is no indication here that LFS engaged in spoliation of evidence; even had there been, the trial judge would not have been required to exclude the evidence highlighted by the Trust. See, e.g., Shaw v. Yellin, 2008 Mass. App. Div. 141, 144 & n.6 (in cases of spoliation, judge has broad discretion in fashioning remedy, and must attempt to impose least severe sanction needed to remedy any prejudice resulting from the spoliation), citing Keene v. Brigham & Women’s Hosp., Inc., 439 Mass. 223, 235-236 (2003). On the second point, although the Trust had indicated in its pretrial conference submission that it intended to call someone to testify as an expert on the fair and reasonable costs of the necessary repair and renovation work, it did not identify the proposed witness by name or specific credentials until the eve of trial. The trial court was well within its discretion in excluding the testimony of a late-disclosed witness. See, e.g., Elias v. Suran, 35 Mass. App. Ct. 7, 10 (1993) (trial judge has broad discretion in deciding whether to permit testimony where party offering the witness has failed to give proper notice of the identity of the expert or the subject matter of the proposed expert’s anticipated testimony). We find no error in the court’s denial of the Trust’s motions in limine.

 In fact, there is no evidence that the Trust exercised more than general supervisory control over any of the work LFS did in managing Trust property. As the Trust notes in its brief: “As Gutzler’s property manager, Ferrari had total control over the bank account: she received the monthly statements; she deposited rent checks; and she wrote all the bills. A decision as to which bills were to be paid, and in what order, was made solely by Ferrari.”

 There is no evidence in the record that the Trust specifically preapproved any of the work or costs associated with repairing the Colozzo unit; it is very clear, however, that when the extensive renovation work on that unit was completed, Gutzler had done a walkthrough of the Colozzo unit, was aware of the scope of the work done, of the fact that LFS had done the work using its own crews, of the total and itemized costs for the work had been, and had approved the work in its entirety. The following year, advised that the Brown and Bonnie units were, respectively, “old and deteriorated” and “a mess,” Gutzler’s response was clear — LFS was to remedy the problems and put the units in conditions suitable for rental.